**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **TAMMY HARTZLER,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **ALEJANDRO MAYORKAS,** | ) |
| _Secretary of Homeland Security_ | ) |
|  | ) |
| **Defendant.** | ) |

**Case No. 20-cv-3802 (GMH)**

_____

**MEMORANDUM OPINION**

This case is an employment discrimination matter involving the Federal Emergency Management Agency ("FEMA"), which itself is a subagency within the Department of Homeland Security headed by Secretary Alejandro Mayorkas ("Defendant"). Plaintiff Tammy Hartzler ("Plaintiff") worked at FEMA from 2014 to 2019, first an intern and then as a Program Analyst in FEMA's Capital Region Office. Plaintiff alleges that, beginning in 2015 and stretching into 2019, she faced a stream of discrimination, retaliation, and other harassing and demeaning conduct from her supervisors at FEMA, and particularly from her first-line supervisor Joe Burchette. Plaintiff, who the parties agree is disabled due to, among other health issues, impairments in her spine and thyroid cancer, says Burchette derided her physical condition, failed to accommodate her disabilities, excluded her from certain work and sent her on assignments he knew were beyond her limited capabilities, denied her bonuses and raises, and ultimately placed her on a performance improvement plan ("PIP")—which led to the revocation of her telework privileges—and then had her fired after she allegedly failed the PIP. More, Plaintiff claims that many of these actions were taken in retaliation against her complaints to FEMA's Equal Employment Opportunity Office

("EEO") that Burchette's actions were discriminatory. Those allegations and more are contained in Plaintiff's 17-count complaint, which features failure to accommodate, discrimination, and retaliation claims under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, retaliation claims under Title VII, 42 U.S.C. § 2000 *et seq.*, and one count of interference with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Having forewent a motion to dismiss, Defendant now moves for summary judgment on all of Plaintiff's claims following discovery, contending they are both procedurally and substantively infirm. Upon review of the record and the parties' briefing, the Court will grant Defendant's motion in full.[1]

## I.    BACKGROUND

The Court will first detail the allegations made in Plaintiff's complaint before providing an overview of the pending motion for summary judgment.

### A.    Plaintiff's Allegations

As explained, Plaintiff worked for FEMA in its Capital Region Office in the Washington, D.C. metropolitan area from the time she was hired as an intern in 2014 to her dismissal in 2019. ECF No. 1 at 1, 10. In Plaintiff's telling, issues arose not long after she began work at FEMA. In 2015, she says, Burchette demeaned her medical conditions and discussed her health issues with other employees, excluded her from meetings, reassigned her duties to others, and denied her training opportunities. ECF No. 1 at 4. As a result of that conduct, Plaintiff alleges that she contacted FEMA's Office of Equal Rights in December 2015 but did not file a complaint at that time. *Id.* at 5.

---

[1] The relevant docket entries for purposes of Memorandum Opinion & Order are: (1) Plaintiff's Complaint (ECF No. 1); (2) Defendant's Motion for Summary Judgment (ECF No. 30 and its attachments); (3) Plaintiff's Opposition to Defendant's Motion for Summary Judgment (ECF Nos. 35 and 36 and its attachments); and (4) Defendant's Reply (ECF No. 40 and its attachments). The page numbers cited herein are those assigned by the Court's CM/ECF system.

Plaintiff also says that, beginning in January 2017, FEMA denied several of her reasonable accommodation requests, which included requests for an ergonomic (ball) chair[2] and workstation. ECF No. 1 at 5.   She says her requests for those reasonable accommodations were denied in January 2017, *see id.*, in April 2017 during a deployment to New York, *see id.*, and in September 2017 as part of deployments to Virginia, Alabama, and Florida, *see id.* at 7.   Additionally, Plaintiff says she was deployed to Fort A.P. Hill in Virginia to "perform non-sedentary work" over her objection "that the deployment duties exceeded her medical restrictions."  *Id.* at 6.  However, there is no indication Plaintiff ever performed any "non-sedentary" work at Fort A.P. Hill, and she concedes that she was reassigned to duty elsewhere in Virginia "[w]ithin 24 hours of driving to Fort [A.P.] Hill for her assignment."  ECF No. 35 at 5–6; *see also* ECF No. 1 at 7.

In November 2017, Plaintiff filed her first EEO complaint, alleging "discrimination on the bases of age, disability, [and] sex," as well as retaliation.  ECF No. 1 at 7.  Thereafter, Plaintiff says the harassment directed toward her only worsened, with Burchette "bull[ying] and mock[ing] [her] on a near daily basis," including telling her coworkers that FEMA was looking for her replacement, mocking her disabilities in front of coworkers, interrupting her and excluding her from meetings, micromanaging and scrutinizing her work, giving her undesirable assignments outside the scope of her position, and then "repeatedly" changing her job title and position description without notice or input.  *Id.* at 8.

Plaintiff alleges that FEMA also failed to accommodate her disability in July 2018 when it again failed to secure an ergonomic chair and workstation for her during a deployment to Alabama. *Id.*  Then, in February 2019, Plaintiff re-contacted FEMA's Office of Equal Rights to discuss

---

[2] Although the parties do not explain, precisely, the nature of Plaintiff's ergonomic ball chair, the Court's understanding is that it is a chair that includes a large, inflated exercise ball as a seat.  *See* ECF No. 30-30 at 19 (indicating that FEMA was to purchase a chair made by Gaiam for Plaintiff (https://www.gaiam.com/products/classic-balance-ball-chair?variant=32936592129)).

"filing a new retaliation complaint." *Id.* at 9. No complaint was filed at that time. However, Plaintiff alleges that, following that meeting, she was given an "false" performance evaluation and then placed on a PIP, which, per FEMA's policies, resulted in the revocation of her telework privileges. *Id.* Specifically, she claims that Burchette met with her in March 2019 to discuss an allegedly inappropriate and unprofessional email she sent and conversation she had with a superior in December 2018. *Id.* Plaintiff says that although no one had mentioned these episodes to her before, Burchette docked her a monetary bonus for 2018—the first year she did not receive one. *Id.* Also at that time, Burchette informed Plaintiff that she was being placed on a PIP and, per FEMA policy, would be ineligible for telework. *Id.* Burchette explained that Plaintiff's placement on a PIP was due in part to her 2018 annual evaluation, wherein he determined that she had performed unsatisfactorily in the areas of "Communication" and "Teamwork and Cooperation." *Id.* The PIP was dated April 22, 2019, *see* ECF No. 30-21, and Plaintiff filed a new EEO complaint several weeks later on May 17, *see* ECF No. 1 at 9. Plaintiff alleges that Burchette's rationale for placing her on a PIP were "false" because she "successfully performed her duties during the review period" (i.e., 2018). *Id.*

On July 11, 2019, Plaintiff received a Notice of Proposed Removal because, according to Burchette, she had failed the PIP. *Id.* Again, Plaintiff disputes that. *Id.* at 10. Plaintiff was employed at FEMA until September 28, 2019, when another supervisor, Kim Kadesch, formally removed her from federal employment, relying on the same reasons Burchette did when concluding that Plaintiff failed her PIP. *Id.* In the interim, Plaintiff also alleges that her attempts in August 2019 to take leave under the FMLA due to a concussion sustained in a May 2019 car accident were denied, as were her requests to telework. *Id.* Finally, days before her termination,

4

Plaintiff claims she received a letter from Burchette informing her that she would not be receiving a within-grade pay raise "due to performance issues." *Id.*

These factual allegations underpin the 17 counts in Plaintiff's complaint. *Id.* at 10–15. Counts 1 to 11 are all brought under the Rehabilitation Act. *Id.* at 10–14. Count 1 alleges that Defendant failed to reasonably accommodate Plaintiff's disability. *Id.* at 10. Counts 2 to 6 contain claims for disability discrimination based on: the denial of a monetary award in 2018 (Count 2); the denial of a pay raise in 2019 (Count 3); revocation of telework privileges (Count 4); the creation of a hostile work environment (Count 5); and termination of her employment (Count 6). *Id.* at 10–12. Counts 7 to 11 contain retaliation claims under the Rehabilitation Act and are based on the same actions that underpin Counts 2 to 6, respectively (i.e., the denial of a monetary award in 2018, the denial of a pay raise in 2019, revocation of telework privileges, the creation of a hostile work environment, and termination of her employment). *Id.* at 12–14. Counts 12 to 16 are all retaliation claims brought under Title VII; like the retaliation claims brought under the Rehabilitation Act, these claims are all based on the same conduct driving the disability discrimination claims. *Id.* at 14–15. Finally, Count 17 alleges that Defendant interfered with the exercise of Plaintiff's FMLA rights when FEMA denied her request for FMLA leave in August 2019. *Id.* at 15.

## B.    Defendant's Motion for Summary Judgment

Defendant opted not to move to dismiss Plaintiff's complaint, so the parties proceeded into discovery and, now, to summary judgment. Defendant's summary judgment motion attacks Plaintiff's claims on multiple fronts. *See generally* ECF No. 30-1. On one flank, Defendant alleges that many of Plaintiff's claims ultimately did not make it into her two EEO complaints and are therefore unexhausted. *Id.* at 19–24. Specifically, Defendant asserts that any discrimination and

retaliation claims arising from 2015 incidents and from the denial of the monetary award in 2018, and the failure to accommodate claims arising from deployments to New York (April 2017), Richmond, Virginia, Alabama, and Florida (September 2017) and the denial of telework in May 2019 cannot proceed because none of those incidents were contained in either of Plaintiff's EEO complaints. *Id.*

Defendant then turns to Plaintiff's discrimination and retaliation claims and argues that much of the conduct she has alleged—including the revocation of telework, the assignment/reassignment of job responsibilities, the denial of training opportunities, the alleged denial of reasonable accommodations, exclusion from meetings, and humiliation at work—is not sufficiently adverse to support her claims. *Id.* at 26–33. He also asserts that FEMA had legitimate, nondiscriminatory and nonretaliatory reasons for taking the actions it did. *Id.* at 37–39. In particular, Defendant explains that the denial of the 2018 performance award was warranted due to Plaintiff's poor work performance that year. *Id.* at 37–38. That poor performance, in turn, is what led to Plaintiff being placed on the PIP—which, under FEMA policy, ended her teleworking arrangement—and Plaintiff's continued failures under the PIP triggered the denial of a pay increase in 2019 and her firing. *Id.* at 38. Defendant avers that Plaintiff has identified nothing that would raise a genuine dispute as to whether her supervisors "'honestly believe[d]' the reasons for rating Plaintiff's performance poorly in 2018, placing her on the PIP in 2019, and then later finding that she had failed that PIP." *Id.* (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

As to Plaintiff's hostile work environment claims, Defendant argues they are grounded in an "'array of unrelated' acts separated by significant gaps in time" that, both individually and collectively, are insufficient to support such a claim. *Id.* at 39–43 (quoting *Baird v. Gotbaum*, 662

F.3d 1246, 1252 (D.C. Cir. 2011))).  Defendant then returns to Plaintiff's exhausted failure to accommodate claims—that is, the September 2017 deployment to Fort A.P. Hill and the July 2018 deployment to Anniston, Alabama.  *Id.* at 43–46.  Those claims cannot go to trial, either, Defendant says, because there is no evidence that FEMA "ended the interactive process" necessary to determine an appropriate accommodation or "participated in the process in bad faith." *Id.* at 45 (quoting *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014)).  As to the Fort A.P. Hill deployment, Defendant explains that Plaintiff served there for less than a day as "FEMA was actively working to redeploy her to a non-austere condition at her own request." *Id.*  The situation in the Alabama deployment was slightly different; there, FEMA actually secured the funding necessary to ship an ergonomic chair and workstation as per Plaintiff's request, but the equipment was not purchased timely and therefore did not arrive on time for Plaintiff's week-long deployment.  *Id.* at 45–46.  Defendant maintains that those logistical issues cannot be attributed "to FEMA's lack of action or bad faith." *Id.* at 46.

Finally, Defendant contends that he is entitled to summary judgment on Plaintiff's FMLA claims because she has no right of action under the FMLA and, even if she did, she cannot show interference because FEMA was in the process of terminating her when it denied her request for leave. *Id.* at 53–55.

In her opposition, Plaintiff maintains that she exhausted *most* of her claims, save for Counts 2, 7, and 12.  ECF No. 35 at 23–24.  As to Count 1—her failure to accommodate claim—she argues that it was exhausted because she alleged in her 2017 EEO complaint that FEMA "denied her reasonable accommodations." *Id.* at 24.  Plaintiff also pushes back against Defendant's contention that revocation of teleworking is not adverse; she claims it is and notes that there is a distinction between disallowing telework in the first instance and terminating an ongoing teleworking

agreement. *Id.* at 26–28. Her claim is of the latter variety, she says. *Id.* She also points to this Court's decision in *Saunders v. Mills*, 172 F. Supp. 3d 74 (D.D.C. 2016), which held that suspension of existing telework privileges was materially adverse in the retaliation context. *Id.* at 28.

Plaintiff then returns to her failure to accommodate claim and argues that a jury could reasonably find that FEMA failed to accommodate her during the July 2018 deployment to Anniston, Alabama because FEMA had known since January 2017 that she required special accommodations—i.e., an ergonomic chair and workstation—yet her request for that deployment, which was made on June 26, 2018, was not approved in time for her deployment. *Id.* at 29–30. She claims that FEMA similar failed to provide her with an ergonomic chair and workstation "on other deployments and at other meetings throughout 2017 and 2018." *Id.*

Plaintiff next defends her discrimination and retaliation claims, arguing that she has made out a prima facie case for each because neither party disputes that she is disabled or that she engaged in protected activity, and that FEMA personnel took adverse action against her following her protected activity. *Id.* at 30–31. Specifically, she points to the revocation of her telework agreement, denial of a pay increase in 2019, and the termination of her employment. *Id.* Notably, Plaintiff defends the "causation" element of her discrimination and retaliation claims, arguing that her supervisors had actual knowledge of her protected activity and subsequently retaliated against her for it. *Id.* at 31–33. She then spends nearly a dozen pages explaining why, in her view, the purported "legitimate" reasons for the actions FEMA took were either false or pretextual. *Id.* at 33–45. She focuses first on whether her performance in 2018 was poor and therefore merited a PIP, *see id.* at 34–38, and then on whether she failed the PIP, which led to her termination, *see id.*

at 38–45.  Finally, she asserts that a trial is necessary to make certain credibility determinations. *Id.* at 45–47.

Defendant's reply notes that Plaintiff did not contest his exhaustion arguments related to the denial of the 2018 performance award, and that summary judgment should therefore be granted in his favor on those claims (Counts 2, 7, and 12).  ECF No. 40 at 8.  He again presses the argument that the denial of telework is not adverse, reasoning that teleworking was privilege Plaintiff enjoyed while during periods of acceptable performance, and that it was only removed after her poor 2018 work evaluation.  *Id.* at 10–12.  Defendant also points to Plaintiff's concession that the lack of telework "affected her stress, anxiety levels, commute time, and evening schedule," and therefore was no more than a "negligible burden" that is not sufficiently adverse to sustain a discrimination or retaliation claim.  *Id.* at 11 (quoting *Baloch v. Norton*, 517 F. Supp. 2d 345, 356 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008)).  Further, and as with Plaintiff's opposition, much of Defendant's reply is devoted to the issue of whether there is a genuine dispute of material fact as to FEMA's purported reasons for revoking her telework arrangement, denying her a pay increase in 2019, and later terminating her.  *Id.* at 13–22. Defendant contends that Plaintiff is overly focused on whether FEMA's reasoning for taking those actions against her were correct or fair, not whether FEMA actually and honestly believed those reasons—as is the standard.  *Id.* at 13–14.  Defendant also reiterates his arguments as to the two exhausted failure to accommodate allegations; as explained, he contends those claims are meritless.  *Id.* at 24–26.  As to the September 2017 deployment to Fort A.P. Hill, Defendant observes that Plaintiff does not allege anything more than she did not have an ergonomic chair or workstation during the fleeting time—less than a day—she spent there.  *Id.* at 24–25.  As to the July 2018 deployment to Alabama, Defendant explains that the delay in approving Plaintiff's

request for accommodations was necessitated by FEMA's need to "fill out the appropriate paperwork to ensure funding for the equipment," and that the subsequent failure to the equipment to arrive on time was not of FEMA's doing. *Id.* at 25–26. Finally, Defendant observes that Plaintiff did not respond to his arguments concerning her FMLA claim and has therefore conceded the issue. *Id.* at 30.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In order to establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of

a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Id.* Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). Nonetheless, a plaintiff is still obligated to support his or

her allegations by competent evidence.  *Id.*  Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation."  *Id.*

### III.    DISCUSSION

Although Plaintiff's 17-count complaint appears expansive at first blush, it ultimately boils down to five actions taken by FEMA that she claims are either discriminatory or retaliatory, plus a handful of situations where she says her disabilities were not accommodated and a single instance where her FMLA rights were allegedly violated.  Again, those five actions are:  the denial of a monetary award in 2018, the denial of a pay raise in 2019, the revocation of her telework privileges, the creation of a hostile work environment, and the termination of her employment.  The Court will address the claims count-by-count, starting with the failure to accommodate claims brought under the Rehabilitation Act, moving to the discrimination and retaliation claims brought under the Rehabilitation Act and Title VII, and ending with the FMLA claim.  For the reasons that follow, the Court will grant Defendant's bid for summary judgment on each of Plaintiff's claims.

### A.    Rehabilitation Act Failure to Accommodate Claim (Count 1)

Plaintiff alleges that FEMA "failed to engage in the interactive process" required by the Rehabilitation Act and "denied [her] reasonable accommodations for her disability."  ECF No. 1 at 10.  Her complaint reflects numerous instances from 2017 to 2019 when FEMA allegedly failed to accommodate her disability, including failing to provide her with:  (i) an ergonomic (ball) chair and workstation in January 2017, *see* ECF No. 1 at 5; (ii) an ergonomic chair, an ergonomic workstation, and alternate travel arrangements for her April 2017 deployment to Albany, New York, *see id.*; ECF No. 35 at 4; (iii) sedentary working conditions for her deployment to Fort A.P. Hill in September 2017, *see* ECF No. 1 at 6; (iv) an ergonomic chair, an ergonomic workstation, sedentary working conditions, and alternate travel arrangements for her September 2017

deployments to Richmond, Virginia; Clanton and Anniston, Alabama; and Tallahassee, Florida, *see id.* at 7; (v) an ergonomic chair and workstation at her D.C. Metro Area offsite locations after 2017, *see id.* at 5; (vi) an ergonomic chair and workstation for her July 2018 deployment to Alabama, *see id.* at 8; and (vii) a telework arrangement in May 2019, *see id.* at 10.  Defendant contends that all but (iii) and (vi) are unexhausted because complaints related to those incidents did not appear in either of Plaintiff's EEO complaints.  ECF No. 30-1 at 22–24.  For the remaining incidents—Plaintiff's September 2017 deployment to Fort A.P. Hill and her July 2018 deployment to Alabama—Defendant asserts that in both cases FEMA met its obligations under the Rehabilitation Act to work together with Plaintiff "so that together they [could] determine what accommodation would enable [her] to continue working."  *Id.* at 45 (quoting *Ward*, 762 F.3d at 32).  The Court agrees with Defendant that many of Plaintiff's failure to accommodate claims are unexhausted and that no reasonable jury could find for Plaintiff on the remainder.  So, the Court will grant summary judgment in Defendant's favor on Count 1.

        1.      Many of Plaintiff's Failure to Accommodate Allegations are Unexhausted

Defendant contends that many of Plaintiff's failure to accommodate allegations are unexhausted because they were not included in her EEO complaints.  ECF No. 30-1 at 22–24.  Plaintiff rejoins that she did, in fact, exhaust her failure to accommodate claims because, "[i]n the 2017 EEO Case, [she] alleged that [FEMA] denied her reasonable accommodations."  ECF No. 35 at 24.  But the failure to accommodate allegations in Plaintiff's 2017 EEO complaint were limited only to her September 2017 deployment to Fort A.P. Hill and her July 2018 deployment to Alabama.[3]  ECF No. 30-15 at 33–34.  Her other failure to accommodate claims are therefore unexhausted and cannot proceed.

---

[3] Plaintiff initially filed this EEO complaint in November 2017, *see* ECF No. 30-15 at 2–9, and it was later amended in August 2018, *see id.* at 24, 33–35.

a.     *The Administrative Exhaustion Doctrine*

As explained, Plaintiff brings her failure to accommodate claim under the Rehabilitation Act, which "mandat[es] administrative exhaustion." *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).[4]   "[T]he D.C. Circuit treats [the Rehabilitation Act's] statutory requirements, like administrative exhaustion, as jurisdictional while regulatory requirements, like time-limits for appeal, as non-jurisdictional." *Williams v. Perdue*, __ F. Supp. 3d __, __, 2020 WL 1892045, at *4 (D.D.C. 2020) (citing *Williams*, 320 F. Supp. 3d at 128), *aff'd*, No. 20-5133, 2020 WL 9595288 (D.C. Cir. Nov. 23, 2020).   Thus, in cases where no administrative complaint is filed, "the court lack[s] jurisdiction over the plaintiff's claims." *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015) (asserting that *Spinelli* "did not attach irremediable jurisdictional consequence to every procedural misstep that happens during exhaustion of the administrative process"); *see also Moore v. Schafer*, 573 F. Supp. 2d 216, 219 (D.D.C. 2008) ("[U]nlike some exhaustion requirements, Section 501's is jurisdictional.").

"The primary purpose of the exhaustion requirement is to provide the agency with sufficient notice to begin the investigative process." *Hernandez v. Mao*, 235 F. Supp. 3d 172, 177 (D.D.C. 2017).   Even after filing an administrative charge, an employee may not bring a civil action for employment discrimination unless she has first received a notice of "final action" taken by the commission.  *See* 42 U.S.C. § 2000e–16(c); *Williams v. Dodaro*, 576 F. Supp. 2d 72, 82 (D.D.C. 2008).   Although the rules of exhaustion "should not be construed to place a heavy,

---

[4] A few courts in this district have noted that *Spinelli* "stands in some tension with the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)." *Williams v. Brennan*, 320 F. Supp. 3d 122, 130 n.3 (D.D.C. 2018), *aff'd*, No. 18-5256, 2019 WL 669716 (D.C. Cir. Feb. 12, 2019).  That is because *Arbaugh* "explained that without a clear statement in the statute labeling a limitation as jurisdictional, courts should presume that such limitation is not jurisdictional." *Dick v. Holder*, 80 F. Supp. 3d 103, 110 n.8 (D.D.C. 2015).  However, *Spinelli* remains good law and the Court is bound by it, and so will apply it here.  *See id.* ("[B]ecause *Spinelli* was decided in May 2006, after *Arbaugh* was issued in February 2006, and because it has not been withdrawn or overruled, this Court is still bound by its holding that exhaustion is jurisdictional under the Rehabilitation Act.").

14

technical burden" on employee-plaintiffs, *Fennell v. AARP*, 770 F. Supp. 2d 118, 126 (D.D.C. 2011) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)), a failure to exhaust administrative remedies "will ordinarily bar a judicial remedy," *Bowe–Connor v. Shinseki*, 923 F. Supp. 2d 1, 5 (D.D.C. 2013).

"Most judges in this district have held that plaintiffs alleging discrete acts of discrimination or retaliation 'must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others.'" *Rashad v. Washington Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (quoting *Coleman–Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137–38 (D.D.C. 2004)); *see also Harris v. Mayorkas*, No. 21-cv-1083, 2022 WL 3452316, at *13 (D.D.C. Aug. 18, 2022) ("[T]he majority of courts in this jurisdiction now require plaintiffs to exhaust each discrete claim of retaliation." (quoting *Jones v. Granholm*, No. 20-cv-472, 2021 WL 2530677, at *7 (D.D.C. June 21, 2021)); *Moran v. Barr*, No. 18-cv-1986, 2020 WL 4286825, at *10 (D.D.C. July 27, 2020) (similar and collecting cases); *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 373 F. Supp. 3d 174, 186 (D.D.C. 2019) (similar); *Rand v. Geithner*, 609 F. Supp. 2d 97, 101 (D.D.C. 2009) (holding that the plaintiff's failure to accommodate request was a discrete act that had to be separately exhausted) (.  That principle applies equally to Rehabilitation Act claims.  *See Pearson v. Chao*, No. 17-cv-1965, 2019 WL 1004040, at *4 (D.D.C. Feb. 28, 2019) ("A federal employee 'may file a . . . Rehabilitation Act action in federal court only after exhausting their administrative remedies before the relevant federal agency for each allegedly discriminatory act.'" (alteration in original) (quoting *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011), *abrogated on other grounds, Doak*, 798 F.3d at 1103)).  But that was not always so.  Indeed, some courts continue to apply the "continuing violation" theory endorsed in *Park*, which held that claims "like or reasonably related to the allegations of the [EEO] charge and

growing out of such allegations" can proceed even if not included in an EEO complaint.  71 F.3d at 907 (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  "Under that standard, claims must 'arise from the administrative investigation that can [be] reasonably expected to follow the charge of discrimination.'"  *Klotzbach-Piper*, 373 F. Supp. 3d at 185 (alteration in original) (quoting *Park*, 71 F.3d at 907).  After *Park*, courts construed its already-expansive exhaustion standard broadly and "permitted a plaintiff to bring suit and recover for all related incidents, even those that were not specifically exhausted" in an EEOC charge.  *Mount v. Johnson*, 36 F. Supp. 3d 74, 83 (D.D.C. 2014) (Brown Jackson, J.) (explaining the post-*Morgan* divergence between the majority and minority approaches in this Circuit).

Seven years after the D.C. Circuit decided *Park*, the Supreme Court substantially undermined its core rationale in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  In that case, the Court "rejected the application of the continuing violation doctrine to discrete acts of discrimination or retaliation," *Klotzbach-Piper*, 373 F. Supp. 3d at 186, making clear that "claims based on discriminatory or retaliatory acts that occurred more than 180 or 300 days before the filing of [an] administrative charge are time-barred, regardless of whether they are 'like or reasonably related to' allegations contained in the administrative charge," *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 136 (D.D.C. 2009).  Importantly, *Morgan* held that "discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*."  536 U.S. at 113 (emphasis added).  And although *Morgan* "dealt with timeliness rather than exhaustion," its rejection of the "like or reasonably related to" and continuing violation theories leaves *Park* on uncertain ground, as other courts in this Circuit have noted.  *See, e.g.*, *Coleman-Adebayo*, 326 F. Supp. 2d at 137 (noting that "*Park* no longer reflects the state of the law" on administrative exhaustion), *amended on reconsideration in part*, 400 F.

Supp. 2d 257 (D.D.C. 2005); *see also Poole v. Gov't Printing Off.*, No. 17-5189, 2018 WL 4147231, at *1 (D.C. Cir. Aug. 9, 2018) (merely "assuming *arguendo* that this court's 'like or reasonably related' exception to Title VII's exhaustion requirements . . . was not displaced by the Supreme Court's decision in" *Morgan*).

While the D.C. Circuit has on several occasions declined to expressly weigh-in on this issue or reconsider *Park*,[5] the Court finds the prevailing majority view in the District Court more concordant with *Morgan*, which emphasized the severable nature of adverse employment decisions. *See, e.g.*, *Morgan*, 536 U.S. at 114 (explaining that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'"); *see also Harris*, 2022 WL 3452316, at *13. Another circuit has reached the same conclusion and held that, following *Morgan*, each distinct instance of retaliatory or discriminatory conduct must be exhausted irrespective of their relation to one another. *See Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003) ("*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted."); *see also Shaw v. Aramark Mgmt. Servs. Ltd. P'ship*, 903 F. Supp. 2d 413, 422 n.7 (E.D. Va. 2012) (noting that "*Martinez* is a persuasive argument for applying *Morgan*" to the exhaustion analysis.), *aff'd*, 516 F. App'x 269 (4th Cir. 2013). More, "[r]equiring a plaintiff to exhaust each discrete claim of discrimination or retaliation" makes a good deal of sense, as it "'comports with the purpose of the exhaustion

---

[5] *See, e.g.*, *Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022) (noting that the Circuit has "twice reserved the question whether *Park* survives *Morgan*, and doing so again); *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 527 n.1 (D.C. Cir. 2019); *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (explaining that the court "need not decide whether *Morgan*" now requires individualized exhaustion of discrete claims); *Weber v. Battista*, 494 F.3d 179, 183–84 (D.C. Cir. 2007); *see also Hazel v. Washington Metro. Area Transit Auth.*, No. 02-cv-1375, 2006 WL 3623693, at *7 (D.D.C. Dec. 4, 2006) ("[T]he D.C. Circuit has not weighed in expressly on the precise reach of *Morgan*.").

doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive.'" *Romero–Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (second alteration in original) (quoting *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74 (D.D.C. 2004)). As the D.C. Circuit has emphasized more generally concerning exhaustion, "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)). And although the exhaustion requirement "should not be construed to place a heavy technical burden" on would-be plaintiffs, neither is it "a 'mere technicality,'" and courts "cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the . . . administrative process." *Park*, 71 F.3d at 907 (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992)). After all, "the employing agency [has] a 'crucial administrative role' in addressing alleged violations," which "rigorous exhaustion requirements" aid in preserving. *Webster*, 49 F.4th at 566 (quoting *Brown v. GSA*, 425 U.S. 820, 833 (1976)).

For these reasons, the Court will apply the majority approach articulated above to Defendant's exhaustion arguments. Notably, Plaintiff does not push for the minority view; indeed, she elides the exhaustion standard altogether.

Further, and consistent with the principle that each discrete claim of discrimination or retaliation must be exhausted, the D.C. Circuit has also held that plaintiffs must mention a claim or the facts underlying it in their administrative complaints to exhaust that particular claim. *See, e.g.*, *Carter v. Nelson*, No. 20-5111, 2021 WL 6139250, at *1 (D.C. Cir. Dec. 27, 2021) (affirming dismissal of failure to accommodate claim where plaintiff "made no mention of her second

accommodation request" in her EEO complaints); *Hamilton v. Geithner*, 666 F.3d 1344, 1350 (D.C. Cir. 2012) (holding that the plaintiff failed to exhaust his administrative remedies where his "formal EEO complaint ma[de] no mention" of the challenged action.); *Robinson–Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 13 (D.D.C. 2008) (dismissing discrimination claims based on the employer's failure to provide the plaintiff with technical assistance for new software because "[t]he EEOC Charge is altogether silent regarding plaintiff's allegation of disparate treatment regarding her requests for help with the installation of the computer software"). That is, "[u]nder *Morgan*," plaintiffs are "required either to include all allegations of discrete acts of discrimination or retaliation in her original EEO complaint, or file a separate EEO complaint or complaints alleging additional discrete acts." *Porter v. Jackson*, 668 F. Supp. 2d 222, 229 (D.D.C. 2009) (granting employer's motion for summary judgment on claims that were not mentioned in the plaintiff's EEO complaints), *aff'd*, 410 F. App'x 348 (D.C. Cir. 2010). This is so because, as explained, "[a] court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the . . . administrative process." *Park*, 71 F.3d at 907.

Additionally, following an employee's submission of an EEO complaint, an agency will oftentimes send a letter to the complainant outlining the claims that have been accepted for investigation known as a "Notice of Acceptance" letter. Some courts in this Circuit have "examined an agency's Notice of Acceptance letter to determine whether the plaintiff administratively exhausted [her] remedies" and have held that, "[i]n cases where the plaintiff did not object" to the claims outlined (i.e., "accepted") in the letter, "the plaintiff effectively abandoned any claims that were not listed, and only the events in the Notice of Acceptance letter were administratively exhausted." *Bozgoz v. James*, No. 19-cv-239, 2020 WL 4732085, at *7 (D.D.C. Aug. 14, 2020); *see, e.g.*, *Cheatham v. Holder*, 935 F. Supp. 2d 225, 237 (D.D.C. 2013) (finding

that Title VII plaintiff failed to exhaust two of four claims included in EEO charge when agency did not include those claims in the issues it agreed to investigate and "[t]hroughout the investigation" the plaintiff "never indicated that the investigation was narrower than his EEO complaint"); *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 68 (D.D.C. 2011) (finding that plaintiff's "'failure to respond to the [agency's] framing of the issue supports a finding that' a plaintiff has failed to exhaust his administrative remedies with respect to those claims not approved by the EEO" (quoting *Sellers v. Dep't of Def.*, No. 07-cv-418, 2009 WL 559795, at *11– 12 (D.R.I. Mar. 4, 2009))); *Green v. Small*, No. 05-cv-1055, 2006 WL 148740, at *6 (D.D.C. Jan. 19, 2006) (finding that a complainant abandons a claim that was alleged in a EEO complaint but not included in an agency's acceptance of claims letter where the complainant fails to respond to the agency's acceptance of claims letter).

With all these principles in mind, the Court will assess Defendant's claim that many of Plaintiff's failure to accommodate claims are unexhausted and therefore not viable.

> b.   *Plaintiff Failed to Exhaust Many of her Failure to Accommodate Claims*

Here, Plaintiff filed two EEO complaints; one in November 2017, and the second in May 2019.  ECF No. 1 at 3; *see also* ECF No. 30-15 (November 2017 complaint); ECF No. 30-16 (May 2019 complaint).  The only failure to accommodate allegations contained in either EEO complaint relate to her September 2017 deployment to Fort A.P. Hill and July 2018 deployment to Alabama. Accordingly, those are the only failure to accommodate claims Plaintiff has exhausted.

The November 2017 EEO complaint described the circumstances of Plaintiff's September 2017 deployment to Fort A.P. Hill and generally alleged discrimination on the basis of age and disability.  *See* ECF No. 30-15 at 3–9.  The complaint did not describe any further alleged failure to accommodate episodes.  Then, in July 2018, Plaintiff sought to update the November 2017 EEO

complaint with additional allegations.  *See* ECF No. 30-15 at 22.  Upon request for specific dates

of her allegations, Plaintiff listed only "07/16/2018" as a time when a reasonable accommodation

"[w]as not provided due to the [reasonable accommodations form] not being completed in time by

my supervisor."  *Id.* at 24.  That date—July 16, 2018—corresponds to Plaintiff's July 2018

deployment to Alabama.  *See* ECF No. 30-28 at 3–4.  On August 27, 2018, FEMA sent Plaintiff a

Notice of Acceptance letter concerning her November 2017 complaint; the letter expressly lists

the September 2017 deployment to Fort A.P. Hill and references the date of the July 2018 Alabama

deployment, but does not list or describe any other failure to accommodate allegations.  *See* ECF

No. 30-15 at 33–34.  The letter further advised Plaintiff to "carefully review the accepted claims

to be investigated" and that if she was "not satisfied with the claims as identified," she could

"submit written clarification of [her] claims."  *Id.* at 34.  If FEMA did not receive any clarifications,

it said it would "assume[] that [Plaintiff was] satisfied with [the] claims as stated and they will be

investigated as identified."  *Id.*  The record does not reflect any subsequent objections or

clarifications from Plaintiff.  As to the May 2019 EEO complaint, neither it nor Plaintiff's

subsequent amendments nor FEMA's final Notice of Acceptance letter mention any failure to

accommodate incidents.  *See* ECF No. 30-16 at 2–5, 14–16, 20–24.

Importantly, Plaintiff disputes none of this.  *See* ECF No. 35 at 24.  Rather, in maintaining

that her failure to accommodate claims are exhausted, Plaintiff points only to FEMA's Notice of

Acceptance letter for the November 2017 EEO complaint.  ECF No. 35 at 24 (citing ECF No. 36-

11).  Again, that document mentioned only her September 2017 deployment to Fort A.P. Hill and

her July 2018 deployment to Alabama.  *See* ECF No. 30-15 at 33–34.  Plaintiff does not—and

cannot—point to any other specific allegation of failure to accommodate her disabilities in her

formal EEO charges.  So, the Court will deem Plaintiff's failure to accommodate claims not arising

from either of the two incidents set forth in the November EEO 2017 complaint as unexhausted. Those unexhausted claims related to the alleged failure to provide Plaintiff with:  an ergonomic chair or workstation in January 2017; an ergonomic chair, an ergonomic workstation, and alternate travel arrangements for her April 2017 deployment to Albany, New York; an ergonomic chair, an ergonomic workstation, sedentary working conditions, and alternate travel arrangements for her September 2017 deployments to Richmond, Virginia, Clanton and Anniston, Alabama, and Tallahassee, Florida; an ergonomic chair and workstation at her D.C. Metro Area offsite locations after 2017; and a telework arrangement in May 2019.

Thus, and consistent with D.C. Circuit precedent, the Court will grant summary judgment to Defendant on the failure to accommodate allegations that were not contained in either of the EEO complaints she submitted to FEMA.  *See, e.g.*, *Carter*, 2021 WL 6139250, at *1; *Hamilton*, 666 F.3d at 1350; *see also Oviedo v. WMATA*, 299 F. Supp. 3d 50, 58 (D.D.C. 2018) (granting summary judgment in defendant's favor where, similar to here, "[p]laintiff has neither alleged nor produced evidence that he filed charges with the EEOC regarding" certain adverse actions listed in his complaint), *aff'd*, 948 F.3d 386 (D.C. Cir. 2020).  The Court also observes that Plaintiff never objected to the claims FEMA accepted for investigation in its final Notice of Acceptance Letters, *see* ECF No. 30-15 at 33–35 and ECF No. 30-16 at 20–23, and so Defendant's motion will be granted on that basis, as well, *see, e g.*, *McKeithan*, 803 F. Supp. 2d at 68 (finding that plaintiff's "'failure to respond to the [agency's] framing of the issue supports a finding that' a plaintiff has failed to exhaust his administrative remedies with respect to those claims not approved by the EEO" (quoting *Sellers*, 2009 WL 559795, at *11–12)).

2.      FEMA Satisfied its Rehabilitation Act Obligations with Respect to the
        Exhausted Disability Claims

Plaintiff's exhausted failure to accommodate claims, then, are the allegations arising from

her September 2017 deployment to Fort A.P. Hill and her July 2018 deployment to Alabama.

Defendant contends that FEMA met its obligations under the Rehabilitation Act to work in good

faith in an interactive process to satisfy Plaintiff's requests related to those deployments.  For her

part, Plaintiff argues that both claims are viable because of FEMA's undue delay in responding to

her accommodation requests and ultimate failure to grant them.  The Court concludes that, on the

present record, no reasonable jury could find that FEMA failed to satisfy its obligations under the

Rehabilitation Act for these two exhausted failure to accommodate claims.  Summary judgment in

Defendant's favor is therefore appropriate.

To make out a prima facie case of disability discrimination under the Rehabilitation Act

for failure to accommodate, a plaintiff must show "(1) that [s]he was an individual with a disability

within the meaning of the statute; (2) that the employer had notice of h[er] disability; (3) that with

reasonable accommodation [s]he could perform the essential functions of the position; and (4) that

the employer refused to make such accommodations." *Scarborough v. Natsios*, 190 F. Supp. 2d

5, 19 (D.D.C. 2002) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).  At trial,

plaintiff bears the burden of proving each of those elements by a preponderance of the evidence.

*See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  The fourth prong of the

standard contemplates "'a flexible give-and-take' between employer and employee 'so that

together they can determine what accommodation would enable the employee to continue

working.'" *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th

Cir. 2005)).  So, "[t]o establish that a request for a reasonable accommodation was denied, a

plaintiff must show either that the employer 'ended the interactive process' necessary to 'determine

an appropriate accommodation' or 'that [the employer] participated in the [interactive] process in bad faith.'" *Tobey v. U.S. Gen. Servs. Admin.*, 480 F. Supp. 3d 155, 168 (D.D.C. 2020) (quoting *Ward*, 762 F.3d at 31–32)). Accordingly, in evaluating a failure to accommodate claim

> courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805). To be clear, "[a]n employer is not liable for denying an accommodation request if it participated 'in good faith' in an 'interactive process' aimed to satisfy the request." *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 73 (D.D.C. 2019) (quoting *Ward*, 762 F.3d at 32); *see also Cogdell v. Murphy*, No. 19-cv-2462, 2020 WL 6822683, at *7 (D.D.C. Nov. 20, 2020) ("[T]he interactive-process line of cases provides that an employer does not deny an accommodation unless it 'end[s] the interactive process or . . . participate[s] in the process in bad faith.'" (alterations in original) (quoting *Ward*, 762 F.3d at 32)). "To demonstrate good faith, an employer can: 'meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome.'" *Ward v. Shinseki*, No. 10-cv-1414, 2012 WL 5839711, at *6 (D.D.C. Nov. 19, 2012) (quoting *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41–42 (D.D.C. 2011)), *aff'd sub nom. Ward v. McDonald*, 762 F.3d 24. On the other hand, obstruction or delay of the interactive process or failure to communicate is suggestive of bad faith. *Ward*, 762 F.3d at 32.

To be sure, "whether a requested accommodation is 'reasonable' is typically a question of fact for the jury," to be decided "based on all the circumstances of the case." *Swormstedt v. Santa*

*Maria Valley R. Co.*, No. 04-cv-0372, 2004 WL 5458405, at *5 (C.D. Cal. Apr. 13, 2004); *see also*

*Noll v. IBM Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) ("The reasonableness of an . . . accommodation

is a 'fact-specific' question that often must be resolved by a factfinder.").  In this Circuit, however,

courts have not hesitated to find that relatively short delays in the provision of accommodations

were reasonable as a matter of law.  *See, e.g.*, *Weatherspoon*, 380 F. Supp. 3d at 71–73 (holding

that a four- or six-month delay in providing an accommodation "was reasonable as a matter of

law" and granting summary judgment in the employer's favor).  Likewise, a "brief revocation" of

accommodations "does not represent a breakdown of the interactive process and thus is not [an]

actionable" Rehabilitation Act claim.  *Tobey*, 480 F. Supp. 3d at 169–70 (concluding that six-week

revocation of accommodations was not actionable under the Rehabilitation Act and granting

summary judgment in the employer's favor).

      With these principles in mind, the Court addresses Plaintiff's September 2017 deployment

to Fort A.P. Hill and her July 2018 deployment to Alabama.

      *a.     September 2017 Deployment to Fort A.P. Hill*

      Plaintiff alleges that FEMA failed to accommodate her disabilities in violation of the

Rehabilitation Act when it deployed her to a non-sedentary position at Fort A.P. Hill in September

2017.  ECF No. 1 at 6–7.  Defendant seeks summary judgment on that claim, arguing that FEMA

quickly responded to Hartzler's concern about non-sedentary work and redeployed her to a site in

Richmond that permitted sedentary work, thereby meeting its obligations under the Rehabilitation

Act.  ECF No. 30-1 at 44–45.  Because the Court finds that no reasonable jury could find in

Plaintiff's favor on this claim, it will grant judgment in favor of Defendant.

      The record reflects the following, undisputed facts concerning Plaintiff's September 2017

deployment to Fort A.P. Hill:  On the afternoon of September 6, 2017, Plaintiff received an email

and phone call informing her that she would be deployed to Fort A.P. Hill in Virginia to support

hurricane relief efforts.  ECF No. 30-4 at 3.  The deployment was to occur on September 7, and

Plaintiff was supposed to report to Fort A.P. Hill at 6:30 a.m. on September 8.  ECF No. 30-25 at

6.  At that time, several large hurricanes had impacted the continental United States, and "FEMA's

disaster workforce" was "stretched."  ECF No. 30-30 at 3.  One of Plaintiff's supervisors, Kim

Kadesch, explained in his deposition that he chose Fort A.P. Hill as Plaintiff's deployment location

because he was

> aware that [Plaintiff] was involved in planning a wedding reception for her son that
> had been delayed and that she had been involved in that for some time.  And I
> was . . . looking out for each of our employees trying to make sure that during this
> time period when we were all directed to deploy from our office that we all had an
> opportunity to go to a place where we could contribute the most and that met, in
> some cases, personal situations that would allow them to continue on with plans
> that they may have had.

ECF No. 30-10 at 3.  Late in the afternoon on September 6, Plaintiff communicated concerns to

another supervisor, Eric Soucie, about the deployment and its potential for non-sedentary work

that she could not perform due to her disabilities.  ECF No. 30-30 at 3–4.  Within 30 minutes,

Soucie responded to Plaintiff's email and asked whether FEMA had "a medical condition . . .

documented for [her]," and emphasized that "taking care of [her] health should be [her] number

one priority."  *Id.*  At 8:00 p.m. on September 7—over 24 hours after her conversation with

Soucie—Plaintiff sent her supervisors a "Form 256", otherwise known as a Request for

Reasonable Accommodation, and requested a ball chair, ergonomic workstation, and sedentary

working conditions on her deployment due to the "potential" for the deployment to be

"nonsedentary."  ECF No. 30-25 at 4–8; ECF No. 36-8 at 2.  In the hours after learning of Plaintiff's

concerns about her deployment, her supervisors went about ensuring that she was re-deployed to

a sedentary position in Richmond.  *See, e.g.*, ECF No. 30-6 at 3–4; ECF No. 30-7 at 3–5; ECF No.

30-8 at 8; ECF No. 30-10 at 4; ECF No. 30-12 at 3; ECF No. 30-13 at 5.  In particular, Kadesch testified that he

> called the region and asked them if they could change [Plaintiff's] deployment to the Virginia location to the Richmond location with that particular Incident Management Assistance Team.  I even called the [Federal Coordinating Officer] that was leading that team and asked him to ensure that [Plaintiff] would be employed as a planner.

ECF No. 30-10 at 4.  Kadesch says he made those calls to "expedite the most satisfactory thing for" Plaintiff.  *Id.*  As those efforts were being made, Plaintiff drove to Fort A.P. Hill from her home in Virginia and reported on the morning of September 8 as instructed.  ECF No. 30-5 at 47–48.  That morning, FEMA officials conferred over email concerning Plaintiff's reasonable accommodation request for sedentary work and discussed where she could be re-deployed.  ECF No. 30-30 at 5.  By 10:51 a.m. on September 8—that is, a little more than four hours after Plaintiff reported to Fort A.P. Hill and 15 hours after she submitted her Form 256—FEMA personnel reported that they had "moved [Plaintiff] over to" a facility in Richmond, Virginia "this morning to work with our planning team."  *Id.* at 5; *see also* ECF No. 30-12 at 3 (noting that Plaintiff "was redeployed to the Virginia State EOC by the morning of September 8, 2017").  Ultimately, the parties agree that Plaintiff spent less than 24 hours at Fort A.P. Hill, and there is no indication she ever performed any non-sedentary work there.  *See* ECF No. 30-5 at 47 (Plaintiff's deposition); ECF No. 30-8 at 8 (Burchette's deposition).

On this record, no reasonable jury could conclude that FEMA either "ended the interactive process" required by the Rehabilitation Act "or that it participated in the process in bad faith." *Ward*, 762 F.3d at 32.  The record shows that FEMA personnel, and Kadesch in particular, worked quickly to ensure that Plaintiff was transitioned away from Fort A.P. Hill to a location where she would be performing sedentary duty.  *See, e.g.*, ECF No. 30-6 at 3–4; ECF No. 30-7 at 3–5; ECF

No. 30-8 at 8; ECF No. 30-10 at 4; ECF No. 30-12 at 3; ECF No. 30-13 at 5.  Indeed, less than 15 hours after she submitted her reasonable accommodations request and a little more than four hours after she officially reported to Fort A.P. Hill, Plaintiff was re-assigned to a facility in Richmond, where it is undisputed that she performed only sedentary work.  ECF No. 30-5 at 49; ECF No. 30-30 at 5.  At the very least, Kadesch's conduct was a "sign of having considered [the] employee's request"—a strong indicator of good faith.  *Ward*, 2012 WL 5839711, at *6.  More, considering that other courts in this Circuit have found that weeks- and months-long delays in providing reasonable accommodations did not violate the Rehabilitation Act, no reasonable jury could infer undue delay from the timeline in this case, and, ultimately, Plaintiff was given the accommodation she sought:  sedentary work.  Indeed, "delay[s] of four to six months . . . [are] not unreasonable." *Tobey*, 480 F. Supp. 3d at 170; *see also Swain v. Wormuth*, 41 F.4th 892, 898 (7th Cir. 2022) (finding that a 20-month delay in installing door openers for employee did not render accommodation of employee's disability unreasonable); *Weatherspoon*, 380 F. Supp. 3d at 71–73 (holding that "[a] four- or six-month wait is not inordinate time" for an agency to procure the requested accommodation); *cf. Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) ("[W]e doubt that a three-year delay in accommodating a plaintiff's disability is not actionable[.]"), *abrogated on other grounds by Green v. Brennan*, 578 U.S. 547 (2016).  Here, the delay with respect to Plaintiff's request for sedentary work was not measured in years, months, or weeks, but *hours*.

Plaintiff's request for a ball chair and ergonomic workstation is a somewhat different story. True, the record indicates that Plaintiff did not receive those items at Fort A.P. Hill, nor did her supervisors appear attentive to her request for them.  ECF No. 30-5 at 49.  Even so, this episode constituted a brief interruption of the accommodations FEMA was already providing to Hartzler.

The record shows that Plaintiff's position was based out of FEMA's headquarters in Washington, D.C., which is where she worked other than during a number of relatively brief deployments, most lasting no more than one to three days and only a few lasting a week or more. *See* ECF No. 30-28 (listing Plaintiff's deployments from 2015 to 2019); *see also id.* at 1 (listing Plaintiff's "Region" as "HQ"); ECF No. 30-5 at 22 (Plaintiff noting that, as of 2017, she worked "predominantly" at FEMA's headquarters), 27 (Plaintiff stating that she introduced herself as an employee "from headquarters"). On January 10, 2017, she submitted a reasonable accommodation request for an "[e]rgonomic chair and work station" at FEMA's headquarters. ECF No. 30-25 at 2. Although it is unclear, exactly, when that request was fulfilled, it was met no later than September 7, 2017, when Plaintiff indicated in her reasonable accommodation request that she had a "reasonable accommodation for a ball chair and ergonomic work station" at "FEMA HQ." *Id.* at 4; *see also* ECF No. 30-5 at 18 (Plaintiff stating that she received a ball chair "at least weeks after [she] had submitted [her] request" in January 2017); *id.* at 19 (Plaintiff stating that she received an ergonomic desk "months later" following her request); ECF No. 30-15 at 22 (Plaintiff noting on July 13, 2018, that she "had ergonomic work station/ball chair at FEMA HQ"). Plaintiff conceded in her deposition that those accommodations were appropriate. ECF No. 30-5 at 18, 20. Thus, Plaintiff's brief deployment to Fort A.P. Hill—which lasted less than 24 hours, *see* ECF No. 35 at 5–6— constituted a short-term interruption from her home base at FEMA headquarters, where it is undisputed that she was receiving adequate accommodations. As explained, courts in this Circuit have found that "brief revocation of accommodations . . . does not qualify as a breakdown of the interactive process," and, in fact, have sanctioned interruptions of accommodations far lengthier than the deployments at issue here. *Tobey*, 480 F. Supp. 3d at 169–70 (granting summary judgment in defendant's favor on Rehabilitation Act claim where the plaintiff's accommodations were

revoked for approximately six weeks because the revocation was "brief" and "not unreasonable" and the accommodations were later restored). Here, no reasonable jury could find that FEMA failed to comply with the Rehabilitation Act when it failed to provide Plaintiff a ball chair and ergonomic work station for less than a day while deploying her on an emergency basis to assist in hurricane relief efforts.[6]

### b.   July 2018 Deployment to Alabama

The other exhausted failure to accommodate claim revolves around Plaintiff's July 2018 deployment for five days to Alabama, when she was not provided with the ergonomic ball chair and desk she requested. *See* ECF No. 1 at 8. Defendant asserts that he is entitled to summary judgment on those allegations, too, because FEMA engaged in the required "flexible give-and-take" process in good faith in attempting to accommodate Plaintiff's disability during that deployment. ECF No. 30-1 at 45–46. Plaintiff contends that Defendant unreasonably delayed in approving her accommodation request related to that deployment—which, like the deployment to Fort A.P. Hill, was relatively short-lived—and that FEMA is therefore liable under the Rehabilitation Act. ECF No. 35 at 8, 29. Defendant has the better of the argument.

The record reflects the following, undisputed facts concerning Plaintiff's reasonable accommodation request concerning her July 17–21, 2018 deployment to Alabama: She learned of the deployment, which was for a training exercise, "about a month" in advance. ECF No. 30-5 at

---

[6] Undeterred, Plaintiff harps on the fact although Burchette claimed in his deposition that he and Soucie "very quickly worked . . . to see that [Plaintiff] was redeployed to a different location in a sedentary environment," he ultimately admitted that other FEMA personnel, including Kadesch, were "the primary action agents for this particular request." ECF No. 35 at 5–6 (quoting ECF No. 30-7 at 3). She also highlights Kadesch's statements during his deposition that he was not "aware" of Burchette "hav[ing] any involvement . . . in changing [Plaintiff's] deployment assignment." ECF No. 35-1 at 5. The factual issue of Burchette's precise role in facilitating Plaintiff's accommodation is immaterial. *Cf. Harris v. Mills*, 478 F. Supp. 2d 544, 547–48 (S.D.N.Y. 2007) ("[C]laims under the Rehabilitation Act may not be brought against individuals, either in their personal or official capacity[.]"), *aff'd*, 572 F.3d 66 (2d Cir. 2009). Again, the ultimate question is whether FEMA as a whole "participated 'in good faith' in an 'interactive process' aimed to satisfy [Plaintiff's] request." *Weatherspoon*, 380 F. Supp. 3d at 73.

63.  When Plaintiff signed up for the training in an online portal, she checked a box indicating that she required accommodations.  *Id.*  In response, personnel from the Alabama site where Plaintiff's training was to be held contacted Plaintiff on June 25, 2018 "to make sure there isn't a reasonable accommodation we need to be aware of in regards to [Plaintiff's] upcoming" training, an outreach Plaintiff concedes was "forward-leaning" and "proactive."  ECF No. 30-30 at 15; ECF No. 30-5 at 64.  At that time, Plaintiff demurred, replying in an email that she "[could] just deflate [her ergonomic] ball [chair] if need be" and pack it in her luggage.  ECF No. 30-30 at 15.

One day later, on June 26, 2018, Plaintiff submitted a Form 256 and formally requested an "ergonomic chair and workspace" for the planned deployment.  ECF No. 30-25 at 9.  The next day, she sent medical documentation supporting her request to FEMA personnel, and the day after that (June 28) sent an updated Form 256, as well as medical documentation and previous Form 256 documents she had filled out, to a broader group of FEMA personnel, including Burchette. ECF No. 36-14 at 8–9; *see also* ECF No. 30-25 at 11.  On June 29, Burchette asked Plaintiff to clarify what, exactly, she was requesting as a reasonable accommodation for the training and to specify if she was "requesting another ball chair."  ECF No. 36-14 at 7–8.  Burchette noted that FEMA had "supported [her] previous requests in a timely manner and [is] committed to continuing that support" and asked to her provide "an updated form with the requested information soonest so that we can get this done in a timely manner."  *Id.* at 8.  In a reply email, Plaintiff agreed that FEMA "has supported my previous request for the ball chair" and asked another FEMA employee on the email chain what additional documentation was required from her.  *Id.* at 7.  The next email in this chain came on July 3, 2018, from a FEMA logistics officer who noted that the Form 256 needed to be "submitted and approved by [FEMA's Office of Equal Rights] before we can move forward with requesting funds to purchase the requested items."  *Id.* at 6.  Burchette replied to that

email on July 10, 2018, attaching the completed Form 256 and indicated that he had approved the request. *Id.* at 5; *see also* ECF No. 30-25 at 19.  Burchette asked another FEMA official on the email chain to provide "the make and model of the chair that we purchased for [Plaintiff] previously."  ECF No. 36-14 at 5.  The FEMA logistics officer replied to Burchette on July 10, 2018 and asked whether the request was "an approved RA" (i.e., "reasonable accommodation") and noted that the items requested by Plaintiff had to be ordered by July 11, 2018 "to ensure it will be here when [Plaintiff] arrives."  *Id*.  The make and model of Plaintiff's chair was later clarified, and the request was officially approved on the morning of July 11.  ECF No. 30-30 at 17–19.  A funding request for the ball chair was submitted that afternoon.  *Id.* at 17.  Later that day, Burchette sent Plaintiff an email noting that he "added language in the comments section" of the Form 256

> to ensure that we are supporting ALL of your requirements based on your physician's note.  Please take a moment to review my comments in the updated FORM 256 to ensure I have not overlooked anything.  We are on track to get the ball chair that you requested for Anniston per the last several emails I received.

*Id.* at 22.  Ultimately, the ball chair did not reach the Alabama training site in time because, as Burchette conceded in both his lay and Rule 30(b)(6) depositions, "the chair was not purchased prior to [Plaintiff's] arrival" in Alabama.  ECF No. 30-7 at 6; ECF No. 30-8 at 9 ("[T]he device was not purchased in time for [Plaintiff] to utilize it there in Alabama."); *also* ECF No. 30-5 at 67 (Plaintiff stating that "on the first day I was there [in Alabama] they told me they did not have my reasonable accommodation, that the chair hadn't arrived.").  The record, however, does not reveal what occurred after the approval of Plaintiff's reasonable accommodation request on July 11 that would explain how or why the chair was not purchased in time.  Further, Plaintiff apparently was not provided with "an alternative ergonomic chair" during the deployment.  ECF No. 30-7 at 6.

As with the September 2017 deployment to Fort A.P. Hill, no reasonable jury could conclude that FEMA "ended the interactive process or that it participated in the process in bad

faith" with respect to her July 2018 deployment to Alabama. *Ward*, 762 F.3d at 32. Here, FEMA personnel in Alabama reached out to her after learning of her accommodation request, at which time Plaintiff said she could bring her own ball chair, *see* ECF No. 30-30 at 15; Burchette asked Plaintiff what she required as an accommodation, noting that FEMA had "supported [her] previous requests"—which Plaintiff agreed with—and was "committed to continuing that support," ECF No. 36-14 at 8; and, ultimately, FEMA approved the request by the date its logistics personnel indicated was the deadline to order the chair for timely arrival in Alabama, *see* ECF No. 30-30 at 17–19. *See Ward*, 2012 WL 5839711, at *6 (noting that indicia of good faith include "meet[ing] with the employee who requests an accommodation . . . ask[ing] the employee what he or she specifically wants, [and] show[ing] some sign of having considered employee's request"). More, Burchette followed-up with Plaintiff and explained that he had added language to the Form 256 "to ensure that we are supporting ALL of your requirements based on your physician's note." ECF No. 30-30 at 22. Although there appears to have been a last-minute error or oversight that resulted in the ergonomic chair ultimately not being provided, Plaintiff has not pointed to any evidence that would show the error was anything more than inadvertence. That is a far cry from a finding that FEMA ceased participating in the interactive process the Rehabilitation Act requires or participated in that process in bad faith. In this case, Plaintiff has not shown that the undisputed chain of email communications between her and FEMA officials is indicative of bad faith or a cessation of the interactive process. *See Weatherspoon*, 380 F. Supp. 3d at 73 ("An employer is not liable for denying an accommodation request if it participated 'in good faith' in an 'interactive process' aimed to satisfy the request." (quoting *Ward*, 762 F.3d at 32)).

Plaintiff instead blames the unfulfilled chair request on the two-week delay between her initial submission of the Form 256 on June 26, 2018, and Burchette's approval of the request on

July 10, 2018.  ECF No. 35 at 8.  Certainly, "[a] party that obstructs or delays the interactive process is not acting in good faith."  *Ward*, 762 F.3d at 32.  However, no reasonable jury could find that Burchette unreasonably delayed the interactive process in these circumstances.  As explained, Plaintiff initially submitted a Form 256 on June 26, and then re-submitted an "updated" Form 256 on June 28.  ECF No. 30-25 at 9, 11.  The very next day, Burchette emailed Plaintiff to clarify her request "so that we can get this done in a timely manner."  ECF No. 36-14 at 8.  Although the record reflects a 10-day (6 working days) gap between that communication and Burchette's ultimate approval of the request on July 10, the approval was made and the funding request submitted by the date FEMA's logistics officer indicated was the deadline for ordering the ball chair in time for Plaintiff's deployment.  *See* ECF No. 30-30 at 17–19; ECF No. 36-14 at 5. Thus, notwithstanding the unexplained gap between Burchette's acknowledgment of Plaintiff's request and his approval of it, her request was nevertheless approved by the date necessary to order the ball chair in time for her deployment (i.e., it was approved on July 11, six days prior to her deployment on July 17).  The fact that her request was not approved more swiftly does not create a triable issue of bad faith, particularly in light of FEMA's consistent communications with Hartzler about her request both before and after that 10-day period.  *See Ward*, 762 F.3d at 35 n.5 ("[I]t does not follow that the [employer] exhibited bad faith by not immediately granting [plaintiff] [the requested] accommodation without further inquiry.").

And, as with the September 2017 deployment to Fort A.P. Hill, the failure to supply Plaintiff with an ergonomic chair and workstation during her five-day deployment to Alabama constituted a brief interruption of the accommodations FEMA was already providing to her. Again, the record reflects that, by no later than September 7, 2017, Plaintiff was provided a ball chair and ergonomic workstation at FEMA's headquarters in Washington, D.C., where her position

34

was based.  ECF No. 30-30 at 4; *see also* ECF No. 5 at 18–19.  As explained, Plaintiff admitted these accommodations were appropriate.  ECF No. 30-5 at 18, 20.  So, as with her brief deployment to Fort A.P. Hill in September 2017, Plaintiff's week-long deployment to Alabama in July 2018 was a short-lived disruption to the accommodations she received at FEMA's headquarters.  Such a transitory revocation of Plaintiff's accommodations is not actionable under the Rehabilitation Act.  *Tobey*, 480 F. Supp. 3d at 169–70 (concluding that a six-week "revocation of [p]laintiff's accommodations does not represent a breakdown of the interactive process and thus is not actionable" under the Rehabilitation Act).[7]

Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's Rehabilitation Act claims arising from her July 2018 deployment to Alabama.

*        *        *        *        *

For foregoing reasons, the Court will grant Defendant's motion for summary judgment on Count 1.  All but two of Plaintiff's failure to accommodate allegations are unexhausted, and those that are exhausted do not reflect the sort of breakdown of the interactive process required to bring a Rehabilitation Act claim before a jury.  The Court now turns to Plaintiff's discrimination and retaliation claims.

**B.      Rehabilitation Act and Title VII Discrimination and Retaliation Claims (Counts 2–16)**

The bulk of Plaintiff's Complaint consists of discrimination and retaliation claims brought under both the Rehabilitation Act and Title VII.  ECF No. 1 at 11–15.  These claims revolve around

---

[7] Plaintiff also faults FEMA's "failure to preemptively provide the accommodations based on its knowledge of [her] continuing need for them."  ECF No. 35 at 29.  Her assertion that FEMA was obligated to "preemptively provide" accommodations without any request is not supported by any legal authority, nor does she dispute or take issue with FEMA's policy requiring "appropriate notice each time . . . a reasonable accommodation" is needed.  ECF No. 30-2 at 10; *see also* ECF No. 30-33 at 16.  Yet even if FEMA was obligated to provide accommodations without notice or based on its knowledge of an ongoing disability, its failure to do so during Plaintiff's relatively brief deployments does not raise an actionable Rehabilitation Act claim for the reasons explained in this section.

five separate allegations:  the denial of a monetary award in 2018 (Counts 2, 7, and 12), the denial

of a pay raise in 2019 (Counts 3, 8, and 13), revocation of telework privileges (Counts 4, 9, and

14), the creation of a hostile work environment (Counts 5, 10, and 15), and termination of her

employment (Counts 6, 11, and 16).  *Id.*  Defendant seeks summary judgment on these claims on

a number of procedural and substantive grounds.  ECF No. 30-1.  The Court assesses each bucket

of claims below.  Before doing so, however, it is helpful to clarify the standards for showing

discrimination under the Rehabilitation Act and retaliation under the Rehabilitation Act and Title

VII.

        1.     Legal Standards

           a.     *Plaintiff's Prima Facie Case*

"Section 501 of the Rehabilitation Act prohibits federal agencies from engaging in

employment discrimination against disabled individuals and further requires agencies to make

reasonable accommodations for persons with disabilities unless such accommodations would

impose undue hardship on the agency."  *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 82 (D.D.C.

2009).  To make out a prima facie case of disability discrimination under a disparate treatment

theory, "a plaintiff must show: (1) that she was an individual who had a disability within the

meaning of the Rehabilitation Act; (2) that she was qualified for the position; and (3) that she

suffered an adverse employment action because of her disability."  *Doe v. Gates*, 828 F. Supp. 2d

266, 270 (D.D.C. 2011) (quoting *Duncan v. Harvey*, 479 F. Supp. 2d 125, 129–30 (D.D.C. 2007));

*see also Xie v. Chao*, No. 21-cv-1289, 2022 WL 3585669, at *3 (D.D.C. Aug. 22, 2022) ("To state

an intentional discrimination claim under the Rehabilitation Act, the plaintiff must allege that he

suffered an adverse employment action because of [her] disability.").  As to the third prong of the

standard—the adverse action requirement—courts in this Circuit had long maintained that the

adverse action must constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"; that is, the plaintiff must have suffered "objectively tangible harm." *Baird*, 662 F.3d at 1248–49 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009); *see Welch v. Skorton*, 299 F. Supp. 3d 102, 111 (D.D.C. 2018) (applying the "significant change" and "objectively tangible harm" standards to Rehabilitation Act claims). Courts applied these same standards to discrimination claims brought under Title VII. *See, e.g.*, *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (stating that Title VII "contains anti-discrimination and anti-retaliation provisions that are indistinguishable from those of the ADA" as incorporated into the Rehabilitation Act); *Chambers v. Sebelius*, 6 F. Supp. 3d 118, 127 n.5 (D.D.C. 2013) ("Courts in this Circuit have applied the same standard in assessing adverse employment actions under Title VII and the Rehabilitation Act."), *aff'd sub nom. Chambers v. Burwell*, 824 F.3d 141 (D.C. Cir. 2016); *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 69 n.5 (D.D.C. 2012) ("The elements of retaliation and discrimination claims are the same under Title VII and the Rehabilitation Act.")

Yet after what it characterized as a "two-decade misadventure," the D.C. Circuit recently repudiated the "objectively tangible harm" adverse action standard for discrimination claims brought under Title VII. *Chambers v. District of Columbia*, 35 F.4th 870, 882 (D.C. Cir. 2022) (en banc). In *Chambers*, the Circuit held that "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete" because "[t]he plain text of Title VII requires no more." *Id.* at 874–75. As the en banc court explained, "[t]he unadorned wording of [Title VII] admits of no distinction between 'economic' and 'non-

economic' discrimination or 'tangible' and 'intangible' discrimination," "[n]or does [it] distinguish between 'subtle' or 'overt' discrimination." *Id*. at 874.  Thus, after *Chambers*, it is no longer necessary that plaintiffs "allege *significant* changes to [their] employment status" to show adverse action in Title VII discrimination claims. *Liu v. Georgetown Univ.*, No. 22-cv-157, 2022 WL 2452611, at *5 (D.D.C. July 6, 2022) (quoting the record).  Rather, what they must show is that "an employer has discriminated against [them] with respect to [their] 'terms, conditions, or privileges of employment' because of a protected characteristic." *Chambers*, 35 F.4th at 874–75.

Although *Chambers* dealt with a denial of a later transfer claim brought under Title VII, it remains an open question as to whether the D.C. Circuit also intended to do away with the "objectively tangible harm" standard for Rehabilitation Act claims.  The argument can certainly be made that because Title VII and Rehabilitation Act claims have long been governed under the same standard, and so change to one impacts the other.  Indeed, Title VII and the Rehabilitation Act share the same operative statutory text. *Compare Gulakowski v. Barr*, No. 19-cv-32 , 2019 WL 4469241, at *2 (D.D.C. Sept. 18, 2019) ("The Rehabilitation Act bars the Government from discriminating against its employees with respect to, among other things, their 'terms, conditions, or privileges of employment' because of that person's disability.") *with Chambers*, 35 F.4th at 873 (explaining that Title VII's antidiscrimination provision "makes it 'an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" (quoting 42 U.S.C. § 2000e-2(a)(1))).  On the other hand, at least one District Court in this Circuit has continued to apply the "significant change" standard to Rehabilitation Act claims even after *Chambers*. *See Xie*, 2022 WL 3585669, at *3 (stating that, for purposes of the Rehabilitation Act,

"[a]n 'adverse employment action' involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'" (quoting *Baird*, 662 F.3d at 1248)).  In this case, the Court need not resolve whether *Chambers* extends to claims brought under the Rehabilitation Act because, even if actions like the revocation of telework privilege are sufficiently adverse, Defendant nevertheless had legitimate, nondiscriminatory, and nonretaliatory reasons for taking such action, which Plaintiff has presented insufficient evidence for a reasonable jury to find were a pretext for discrimination or retaliation.

The concerns about how to construe *Chambers* do not extend to Plaintiff's retaliation claims brought under Rehabilitation Act and Title VII, however.  As this Court has explained, "*Chambers* is careful to make clear it does not overrule any D.C. Circuit precedent on Title VII retaliation claims." *Harris*, 2022 WL 3452316, at *11 n.10.  "The elements of a retaliation claim under the Rehabilitation Act require the plaintiff to show that '(1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action.'" *Congress v. District of Columbia*, 514 F. Supp. 3d 1, 16–17 (D.D.C. 2020) (quoting *Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 16 (D.D.C. 2016)).  As with discrimination claims, this is the same standard applicable to Title VII retaliation claims. *See, e.g.*, *Norden v. Samper*, 503 F. Supp. 2d 130, 156 (D.D.C. 2007) ("[T]he Rehabilitation Act itself provides a cause of action for retaliation that is governed by the same legal standard as a retaliation claim under Title VII.").  In the retaliation context, an adverse action is one that is "harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  Notably, this standard

"involve[s] something short of what would ordinarily be considered a 'personnel action' (e.g., denial of promotion, discharge, salary reduction)," in the discrimination context. *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 75 (D.D.C. 2007); *see also Chambers*, 35 F.4th at 876 ("Unlike the antidiscrimination provision, the antiretaliation provision . . . prohibits even retaliatory actions that do not affect the terms, conditions, or privileges of employment, for example, an employer making a false criminal charge against an employee who had complained of discrimination, or a law enforcement agency refusing to investigate death threats made against an employee who had complained of discrimination." (internal citations omitted)). However, actionable *retaliation* claims "are [still] limited to those where an employer causes '*material* adversity,' not 'trivial harms,'" *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting *Burlington N.*, 548 U.S. at 68), a principle left undisturbed by *Chambers*.

### b. Non-discriminatory, Non-retaliatory Reason for Decision

Once a plaintiff makes out a prima facie case of discrimination and/or retaliation, "the burden then shifts to the employer to offer a legitimate non-discriminatory, non-retaliatory reason for the challenged decision." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [action]" so as to "raise[ ] a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). Yet the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254; *see also Smith v. Hartogensis*, 541 F. Supp. 3d 1, 9 (D.D.C. 2021) (noting that the burden to show a legitimate non-discriminatory, non-retaliatory reason for the employment action "is one of production"). However, "the reason must be facially 'credible' in light of the proffered evidence" and the evidence "must present a 'clear and reasonably specific explanation.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019) (first quoting *Bishopp v. District of Columbia*,

788 F.2d 781, 788 (D.C. Cir. 1986), then quoting *Segar v. Smith*, 738 F.2d 1249, 1269 n.13 (D.C. Cir. 1984)).  If the employer offers such a legitimate, non-discriminatory or non-retaliatory reason for the challenged decision, "whether the employee actually made out a *prima facie* case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'"  *Brady*, 520 F.3d at 493 (alteration in original) (first quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993), and then quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).  Instead, "in considering an employer's motion for summary judgment . . . the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and the employer intentionally discriminated [or retaliated] against the employee . . . ?"  *Id.*; *see also, e.g.*, *Kersey v. Washington Metro. Area Transit Auth.*, 586 F.3d 13, 16–17 (D.C. Cir. 2009) (explaining that, in the context of a motion for summary judgment under the Rehabilitation Act, after the defendant provides a legitimate, non-discriminatory reason for the challenged action, "the sole remaining issue [is] discrimination [or retaliation] *vel non*" and that "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason" (alterations in original) (first quoting *Reeves*, 530 U.S. at 142–43 (2000), and then quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003))).

     *c.*  *Pretext*

   As Defendant notes, upon the proffering of a legitimate, nondiscriminatory and nonretaliatory reason for the adverse action, "plaintiff must show '*both* that the reason was false, *and* the discrimination [or retaliation] was the real reason.'"  ECF No. 30-1 at 26 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

> A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). Nevertheless, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves*, 530 U.S. at 147; *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc) (declining to hold that "a plaintiff who creates a genuine issue of material fact as to whether the employer has given the real reason for its employment decision will *always* be deemed to have presented enough evidence to survive summary judgment," but declining to adopt a rule "under which employment discrimination plaintiffs would be routinely required to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," because "if the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination"). But where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.* Ultimately, it "is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs." *Crockett v. Richardson*, 127 F. Supp. 2d 40, 47 (D.D.C. 2001); *see also Fischbach*, 86 F.3d at 1183 ("[T]he issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons

it offers.'" (alterations in original) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

2.      Denial of a Monetary Award in 2018 (Counts 2, 7, and 12)

The Court will begin first with Plaintiff's claims that FEMA discriminated (Count 2) and retaliated (Count 7) against her in violation of the Rehabilitation Act and retaliated against her in violation of Title VII (Count 12) when it denied her a monetary award (i.e., a bonus) for 2018.  As a reminder, she says she was denied a monetary award on account of her 2018 performance review, wherein Burchette rated her performance "as unsatisfactory overall," as well as in the domains of "Communication" and "Teamwork and Cooperation."  ECF No. 1 at 9.  Plaintiff contends those low ratings were baseless and instead were motivated by animus on account of her disability and her prior protected activity.  Defendant says the claims are unexhausted and seeks summary judgment in its favor on that basis.  ECF No. 30-1 at 21–22.  Notably, Plaintiff does not contest the exhaustion argument.  ECF No. 35 at 23–25. Whatever the merits of Plaintiff's allegations concerning the denial of a monetary award for 2018, the Court will grant Defendant summary judgment as to those claims because it finds, for the reasons stated below, that Plaintiff has conceded Defendant's exhaustion arguments.

a.      *Plaintiff Conceded Defendant's Arguments on Counts 2, 7, and 12*

"It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Nwachuku v. Jackson*, 605 F. Supp. 2d 285, 286 n. 1 (D.D.C. 2009) (alteration in original) (quoting *United States v. Real Property Identified as: Parcel 03179–005R*, 287 F. Supp. 2d 45, 61 (D.D.C. 2003)); *see also Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (same), *aff'd*,

98 F. App'x 8 (D.C. Cir. 2004).  Applying that principle, courts have granted summary judgment on claims that the non-moving party failed to defend in their opposition.  *See, e.g.*, *Holassie v. District of Columbia*, No. 16-cv-2053, 2022 WL 296288, at *1 n.2 (D.D.C. Feb. 1, 2022) (concluding that, where the plaintiff opposed summary judgment only on his claims under Title VII, the District of Columbia Human Rights Act, and the District of Columbia Whistleblower Protection Act, and did not address his unlawful invasion of privacy claim, the court would "treat[] the [defendant's] argument as to the invasion of privacy claim as conceded"); *see also Hajjar–Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 128 (D.D.C. 2014) ("[A] Plaintiff is not entitled to rely on the allegations in h[er] Complaint to create a genuine issue of material fact at the summary judgment stage.").

Here, Defendant contends that Plaintiff failed to exhaust her remedies as to her claims arising from the denial of a monetary award for 2018 because those claims are listed nowhere in either her November 2017 or May 2019 EEO complaints.  ECF No. 30-1 at 21–22.  Plaintiff does not address those arguments.  Indeed, she conspicuously omits Counts 2, 7, and 12 from the list of her claims she says were exhausted.  *See* ECF No. 35 at 23 ("Plaintiff exhausted Counts 1, 3–6, 8–11, and 13–16.").  She has therefore conceded Defendant's argument, and the Court will grant summary judgment in Defendant's favor on Counts 2, 7, and 12 on that basis.  *See, e.g.*, *Holassie*, 2022 WL 296288, at *1 n.2, *8 (granting summary judgment to defendant on claim that was made in plaintiff's complaint but that plaintiff did not mention in their opposition brief).

> b.    *Even if Not Conceded, Defendant is Entitled to Summary Judgment on Counts 2, 7, and 12*

Yet even if Plaintiff had not conceded Defendant's exhaustion argument, the Court would nevertheless have found her claims arising from the denial of a monetary award for 2018 unexhausted.  As explained, the D.C. Circuit has held more than once that allegations not contained

within formal EEO complaints are unexhausted. *See, e.g.*, *Carter*, 2021 WL 6139250, at *1; *Hamilton*, 666 F.3d at 1350. Neither the November 2017 nor May 2019 EEO complaints mentions the denial of the monetary award, *see* ECF No. 30-15 at 33–34 and ECF No. 30-16 at 21–22, and so the Court concludes that claims arising from those allegations are unexhausted. Importantly, Plaintiff does not dispute that her EEO complaints do not mention the denial of a monetary award for 2018. There being no dispute of material fact on the exhaustion issue, the Court will grant summary judgment on Counts 2, 7, and 12 in Defendant's favor. *See, e.g.*, *Oviedo*, 299 F. Supp. 3d at 58; *see also Stewart v. White*, 61 F. Supp. 3d 118, 130 (D.D.C. 2014) ("[T]he Court, finding no genuine factual dispute on the exhaustion question, will grant summary judgment to defendant on the unexhausted" claims.).

### 3. Hostile Work Environment (Counts 5, 10, and 15)

The Court now addresses what it considers Plaintiff's hostile work environment claims. Although Plaintiff couches the claims as discrimination (Count 5) and retaliation (Counts 10 and 15), all hinge on whether she was subjected to a hostile work environment. *See* ECF No. 35 at 45 (Plaintiff characterizing her allegations as "hostile work environment claims"). Defendant says she was not because her allegations merely constitute an "'array of unrelated [alleged] discriminatory or retaliatory acts' that are not sufficiently connected to each other" and otherwise do not rise to the requisite level of severity or pervasiveness required for a viable hostile work environment claim. ECF No. 30-1 at 40 (quoting *Baird*, 662 F.3d at 1252). Plaintiff's opposition is brief and conclusory, asserting that "[a] reasonable jury could find" that the conduct she was allegedly subjected to "created a hostile work environment." ECF No. 35 at 45. Yet as serious as they may be, Plaintiff's allegations, even if true, do not suffice to establish a hostile work

45

environment.   The Court will therefore grant Defendant's motion for summary judgment on Counts 5, 10, and 15.

        *a.*      *Legal Standard for Hostile Work Environment Claims*

Preliminarily, the Court notes that "the D.C. Circuit has not affirmatively decided 'whether the Rehabilitation Act provides a cause of action for a hostile work environment.'"  *Moore v. Brouillette*, No. 20-cv-1060, 2020 WL 7318007, at *7 (D.D.C. Dec. 11, 2020) (quoting *Sanders v. Kerry*, 180 F. Supp. 3d 35, 45 n.10 (D.D.C. 2016)).  Still, "the D.C. Circuit has been willing to assume that a hostile work environment could be a form of discrimination under the Rehabilitation Act," *Bonnette*, 907 F. Supp. 2d at 80 (citing *Kuraner v. Mineta*, No. 00-5416, 2001 WL 936369, at *1 D.C. Cir. July 10, 2001) (per curiam)), and district "courts in this jurisdiction consistently recognize the viability of hostile work environment claims under the Rehabilitation Act," *Moore*, 2020 WL 7318007, at *7.  Defendant does not dispute the existence of such a claim in his papers.  Accordingly, as others have done, this Court "will recognize the existence of a hostile work environment claim under the Rehabilitation Act here."  *Id.*

The basic elements of a hostile work environment claim are:

(1) [the plaintiff] is a member of a protected class; (2) [the plaintiff] was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it.[8]

---

[8] The Court observes that "nothing in *Chambers* alters the pleading requirements for Title VII hostile work environment claims.  Indeed, and just as with Title VII retaliation claims, *Chambers* distinguished discrimination claims from allegations of a hostile work environment, noting that cases involving the latter 'have no bearing on a case in which an employer discriminates against an employee with respect to the *actual* terms or conditions of employment.'"  *Harris*, 2022 WL 3452316, at *15 n.14 (quoting *Chambers*, 35 F.4th at 877–78 (explaining that, unlike Title VII discrimination cases, "[t]he thrust of the hostile work environment cases is that an abusive working environment amounts to a '*constructive* alteration in the terms or conditions of employment' only if harassment is severe or pervasive" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)))).

*Peters v. District of Columbia*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012); *see also Baloch*, 550 F.3d

at 1201 (noting that, to prevail on a Title VII hostile work environment claim, "a plaintiff must

show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)));

*Laughlin v. Holder*, 923 F. Supp. 2d 204, 219–20 (D.D.C. 2013) (dismissing a hostile work

environment claim where the plaintiff's complaint contained "no allegations of discriminatory or

retaliatory 'intimidation, ridicule, [or] insult' in her day-to-day work environment" (alteration in

original) (quoting *Harris*, 510 U.S. at 21)).  This analysis requires the Court to look "'at all the

circumstances,' including the 'frequency of the [alleged] discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Vickers v. Powell*, 493 F.3d 186,

197 (D.C. Cir. 2007) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).  The

Court must "assess the timeline of events as a whole," to determine whether, in totality, the facts

may plausibly support a conclusion that the conduct "alter[ed] the conditions of [her] employment

and create[d] an abusive working environment." *Brooks v. Grundmann*, 748 F.3d 1273, 1276

(D.C. Cir. 2014) (second alteration in original) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572,

577 (D.C. Cir. 2013)).  "Generally speaking, '[u]se of the same discrete acts, upon which the

plaintiff bases h[er] discrimination and retaliation claims, to support a hostile work environment

claim is disfavored.'" *Adams v. U.S. Dep't of the Navy*, No. 17-cv-1618, 2020 WL 2308581, at

*6 (D.D.C. May 8, 2020) (alterations in original) (quoting *Townsend v. United States*, 236 F. Supp.

3d 280, 312 (D.D.C. 2017)).  Importantly, the D.C. Circuit has applied these standards in cases

where, as here, "the alleged retaliation is a hostile work environment." *Touvian v. District of*

*Columbia*, 330 F. Supp. 3d 246, 254 n.4 (D.D.C. 2018); *see also Baird v. Gotbaum*, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (applying the "severe or pervasive" standard to retaliatory hostile work environment claim).

> b.     *Defendant is Entitled to Judgment on Plaintiff's Hostile Work Environment Claim*

As a matter of law, Defendant is entitled to judgment on Plaintiff's hostile work environment claims because, even viewing the evidence in the light most favorable to her and drawing all reasonable inferences in her favor, they do not suffice to show that she was subjected to severe and pervasive ridicule and harassment. Indeed, many of Plaintiff's allegations constitute "work-related actions by supervisors" that "courts typically do not find . . . sufficient for a hostile work environment claim." *Munro v. LaHood*, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (quoting *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011)). For one, being "micromanaged" and "scrutinized," as Plaintiff claims she was, *see* ECF No. 1 at 8, "are the type of 'work-related actions by supervisors' that provide insufficient grounds for a hostile work environment claim." *Bonnette*, 907 F. Supp. 2d at 81 (granting summary judgment in employer's favor on hostile work environment claim where plaintiff alleged, among other things, "micromanagement of her work"); *see also Nurriddin*, 674 F. Supp. 2d at 94 ("[C]lose scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context" and therefore do not support hostile work environment claims.). The same goes for her claims that her duties were reassigned, she was given undesirable work, and was excluded from meetings. *See, e.g.*, *Martinez v. P.R. Fed. Affairs Admin.*, 813 F. Supp. 2d 84, 97 (D.D.C. 2011) (finding heightened scrutiny and reassignment of job duties to others not so pervasive, severe, or abusive as to create a hostile work environment); *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (holding that an employee's claims

that, among other things, she was regularly excluded from meetings and given undesirable work assignments did not establish a hostile work environment); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) (holding that claims that the plaintiff was assigned less favorable work, among other things, did not establish a hostile work environment). Denial of opportunities to participate in trainings is likewise insufficient to maintain a hostile work environment claim, *see, e.g.*, *Pearsall v. Holder*, 610 F. Supp. 2d 87, 98 & n.10 (D.D.C. 2009) (finding that allegations of denial of training and underutilization in a role did not support a hostile work environment claim); *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 354 (D.D.C. 2013) (collecting cases in which denials of training were insufficient to state a claim for a hostile work environment), as are Plaintiff's allegations of "unfair" performance ratings, *see, e.g.*, *Allen v. Napolitano*, 774 F. Supp. 2d 186, 206 (D.D.C. 2011) (holding that "performance reviews . . . are insufficiently severe to support a hostile work environment claim"); *Na'im v. Rice*, 577 F. Supp. 2d 361, 377 (D.D.C. 2008) (finding that plaintiff's low performance ratings, even when coupled with other allegedly hostile conduct, did not constitute a hostile work environment).

Further, being placed on a PIP is also in the category of "work-related actions by supervisors" that simply are not sufficiently adverse to support a hostile work environment claim. *See Munro*, 839 F. Supp. 2d at 361, 365–66 (finding no hostile work environment where plaintiff was placed on a PIP, yelled at, given unfavorable performance reviews, and told that he could not submit any more assignments). Additionally, courts in this Circuit have also made clear that denial of leave—which Plaintiff says occurred when FEMA rejected her FMLA request—is not the stuff of a hostile work environment, even when combined with other undesirable conduct. *See, e.g.*, *Hussain v. Nicholson*, 435 F.3d 359, 366–67 (D.C. Cir. 2006) (affirming summary judgment for defendant on hostile work environment claim because no reasonable jury could find a hostile work

environment based on a denial of promotion, denial of medical leave, poor performance evaluations, and threats of termination); *see also Nurriddin*, 674 F. Supp. 2d at 93–94 (granting a motion to dismiss Title VII hostile work environment claim premised in part on repeated denial of leave requests).  The Court also holds that changes in an employee's position description, even where done without the employee's input or approval, are not the type of "severe and pervasive discriminatory intimidation or insult" that are required to demonstrate a hostile work environment. *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003); *see, e.g.*, *Hussain v. Hutierrez*, 593 F. Supp. 2d 1, 7 (D.D.C. 2008) (stating that complaints about a changing job description "d[id] not support a hostile work environment cause of action").

Plaintiff also alleges a number of incidents where she was verbally ridiculed, including having her medical conditions insulted and discussed openly.[9]  But these, too, are not enough to sustain a hostile work environment claim.  Although such conduct is uncivil and unbecoming of a respectful workplace, "[t]he Supreme Court has made it clear that Title VII does not establish a 'general civility code for the American workplace,'" nor does it "prohibit all verbal or physical harassment in the workplace."  *Pauling v. District of Columbia*, 286 F. Supp. 3d 179, 209 (D.D.C. 2017) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  As this Court has noted before, "in this jurisdiction, 'simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim.'"  *Harris*, 2022 WL 3452316, at *17 (quoting *Dudley v.*

---

[9] In her deposition, Plaintiff also alleged that Burchette issued a veiled threat that she "wouldn't be working [at FEMA] much longer" and that she was yelled at by another supervisor while on a deployment in 2018.  ECF No. 30-5 at 74–75.  Although these allegations are not contained in the operative complaint, they also do not bolster Plaintiff's hostile work environment claims.  *See, e.g.*, *Gray v. Foxx*, 637 F. App'x 603, 605, 608 (D.C. Cir. 2015) (evidence that supervisor "yelled and screamed" at plaintiff during her employment was not sufficient to establish a hostile work environment); *Vickers*, 493 F.3d at 198–201 (concluding that a hostile work environment was not created by a supervisor's "angry threats" and derogatory comments about minorities; *Xie*, 2022 WL 3585669, at *5 (concluding that the plaintiff's supervisor's "alleged threats and aggressive behavior also did not create a hostile work environment" because "single incidents are rarely severe or pervasive enough to constitute a hostile work environment" (quoting *Ham v. Ayers*, No. 15-cv-1390, 2019 WL 1202453, at *5 (D.D.C. Mar. 14, 2019))).

*Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 171 (D.D.C. 2013)).   So, and
consistent with the findings of other courts in this Circuit, the Court concludes that Plaintiff's
allegations of verbal abuse do not support her hostile work environment claim.   *See, e.g.*, *Porter*,
668 F. Supp. 2d at 235–36 (granting summary judgment in the employer's favor where the
plaintiff's hostile work environment claims included allegations that her supervisors "mocked her
health problems" and "disclosed embarrassing details about her medical condition to other
employees"); *see also Pauling*, 286 F. Supp. 3d at 194, 210 (granting summary judgment in the
employer's favor where the plaintiff complained of a hostile work environment and alleged that
her supervisor made "insulting or offensive remarks about [her] medical healthcare status").

What is left, then, are the allegations that comprise the bulk of Plaintiff's retaliation and
discrimination claims—that is, the failure to accommodate her disabilities, the denial of a monetary
award in 2018, the denial of a pay raise in 2019, revocation of telework privileges, and termination
of her employment.   But courts in this Circuit "frown on plaintiffs who attempt to bootstrap their
alleged discrete acts of retaliation into a broader hostile work environment claim."   *Baloch*, 517 F.
Supp. 2d at 364.   Indeed, some have held that plaintiffs "cannot . . . rely on the discrete acts upon
which" they "base[] [their] discrimination and retaliation claims to support a hostile work
environment claim."   *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56–57 (D.D.C. 2011).   That
principle draws strength from the notion that "[d]iscrete acts constituting . . . retaliation
claims . . . are different in kind from a hostile work environment claim that must be based on severe
and pervasive discriminatory intimidation or insult."   *Lester*, 290 F. Supp. 2d at 33.   Yet even if
the Court does consider the allegations that also comprise Hartzler's discrimination and retaliation
claims, no reasonable jury could conclude that she was subjected to a hostile work environment.

As explained, Plaintiff concedes that she did not exhaust her claim that she was denied a monetary award for 2018.  But even if she had, the denial of a bonus does "not establish 'severe or pervasive' harassment."  *Moore v. U. S. Dep't of State*, 351 F. Supp. 3d 76, 91 (D.D.C. 2019) (concluding that plaintiff's "failure to receive any . . . performance-based bonuses" for several years did not establish a hostile work environment, even when coupled with other conduct).  Nor does the denial of a within-grade pay increase.  *See, e.g.*, *Tillman v. Barr*, No. 17-cv-475, 2019 WL 2550736, at *4–5 (D.D.C. June 20, 2019) (finding that denial of a within-grade pay increase, even when considered alongside a slew of other allegedly harassing conduct, did not suffice to show a hostile work environment); *Nurriddin*, 674 F. Supp. 2d at 94 (same); *see also Johnson v. District of Columbia*, 572 F. Supp. 2d 94, 109–110 (D.D.C. 2008) (dismissing a hostile work environment claim where the plaintiff alleged, among other things, that he was not paid a promised pay increase).  More, and to the extent that the Notice of Proposed Removal was a threat of termination, that, too, is not sufficiently demeaning or harassing to make out a hostile work environment claim.[10]  *See, e.g.*, *Hussain*, 435 F.3d at 366 (affirming summary judgment for defendant on hostile work environment claim because no reasonable jury could find a hostile work environment based on, among other things, "termination threats"); *see also Stevenson v. Delta Airlines, Inc.*, 251 F. Supp. 3d 265, 268 (D.D.C. 2017) (dismissing hostile work environment claim based on, among other things, "constant threats of termination").  The Court also agrees with a

---

[10] Plaintiff appears to suggest in her opposition that the termination of her employment also contributed to the hostile work environment she claims existed.  ECF No. 35 at 45.  To extent she makes that argument, it is misplaced.  "Termination itself is not harassing conduct, and while it can be an instance of disparate treatment, it does not *create* a hostile work environment because it *eliminates* the existence of a work environment all together."  *Roberts v. Health Partners Plans, Inc.*, No. 17-cv-297, 2017 WL 3310691, at *5 (E.D. Pa. Aug. 3, 2017) ("Termination is a discrete act, and is not a component of a hostile work environment claim."); *see also Jones v. Glaxosmithkline, LLC*, 755 F. Supp. 2d 138, 153 n. 12 (D.D.C. 2010) ("Harassment and termination are different events: for instance, one occurs during employment and the other ends employment.").  So, "[w]hile termination can speak to the detrimental effect element of a hostile work environment claim, it is not proof of the severe or pervasive harassment element itself."  *Roberts*, 2017 WL 3310691, at *5.

number of others in this Circuit that have concluded that denial of telework privileges also falls short of establishing an abusive workplace.  *See, e.g.*, *Xie*, 2022 WL 3585669, at *5 (concluding that "[d]enying requests for telework" did not suffice to show a hostile work environment); *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 8 (D.D.C. 2019) (concluding that "a plaintiff's being denied . . . the opportunity to telecommute," among other things, "came 'nowhere near satisfying the . . . standard' for a hostile work environment" (second alteration in original) (quoting *Beckwith v. Ware*, 174 F. Supp. 3d 1, 5–6 (D.D.C. 2104))); *Koch v. White*, 134 F. Supp. 3d 158, 167-68 (D.D.C. 2015) (finding that denials of certain accommodations, including request for "part-time telework arrangement," did not create hostile work environment claim).  Finally, the Court found in Section III.A.2, *supra*, that Defendant did not fail to accommodate Plaintiff's disabilities in violation of the Rehabilitation Act, and so those allegations also do not support her hostile work environment claims.  *See Floyd v. Lee*, 85 F. Supp. 3d 482, 518–19 (D.D.C. 2015) ("[B]ecause the [c]ourt grants summary judgment on [the plaintiff's] failure-to-accommodate claim . . . she cannot rely on the denial of accommodation to support her hostile work environment claim.  Put differently, if a plaintiff could not prevail on a standalone failure-to-accommodate claim, the same alleged lack of accommodation could not constitute 'severe or pervasive' harassment for purposes of a hostile work environment claim."); *see also Matos v. DeVos*, 317 F. Supp. 3d 489, 503 (D.D.C. 2018) ("To the extent that summary judgment is appropriate to the Department on Matos's failure to accommodate claim, the same allegations cannot support a hostile work environment claim."), *aff'd*, No. 18-5281, 2019 WL 2563721 (D.C. Cir. June 3, 2019).

Even when "[t]aken together," Plaintiff's allegations do not permit the conclusion that her "workplace was permeated with intimidation, ridicule and insult, and certainly not to an extent the conditions of her employment were altered."  *Marcus v. Yellen*, No. 09-cv-1686, 2022 WL

3910568, at *22 (D.D.C. Aug. 31, 2022), *appeal docketed*, No. 22-5260 (D.C. Cir. Sept. 30, 2022).

Notably, other courts in this Circuit have rejected hostile work environment claims in factual circumstances the Court perceives as equally or more abusive and oppressive than the circumstances in this case. *See, e.g.*, *Baloch*, 550 F.3d at 1201 (affirming grant of summary judgment on hostile work environment claim where plaintiff's supervisor yelled at, used profanity toward, and threatened arrest of plaintiff); *George*, 407 F.3d at 408, 416–17 (affirming grant of summary judgment on hostile work environment claim where statements by three employees over six-month period that plaintiff should "go back where she came from" and separate acts of yelling did not rise to level of severity necessary to find hostile work environment); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (holding that the plaintiff's claims that the defendant "caressed [him] on his knee, placed her breast on [his] arm, and placed her fingers on [his] buttocks" were not sufficiently severe to create a hostile work environment (alterations in original) (quoting the record)); *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (finding no hostile work environment when one co-worker called the plaintiff a racial slur and another co-worker said "black woman were at the bottom. The white men were first, the white women were right up there with them").

For the foregoing reasons, Defendant is entitled to judgment on Counts 5, 10, and 15. The Court turns next to Plaintiff's discrimination and retaliation claims based on the denial of her telework privileges.

4.      Revocation of Telework Privileges (Counts 4, 9, and 14)

Plaintiff alleges that FEMA discriminated (Count 4) and retaliated (Counts 9 and 14) against her in in March 2019 when it revoked her telework privileges.[11]  ECF No. 1 at 11, 13–15.

---

[11] Here, the Court assumes that the revocation of Plaintiff's teleworking privileges is adverse.  Prior to *Chambers*, "[c]ourts in this and other jurisdictions . . . repeatedly held that denial of a telework arrangement on its own does not

But FEMA argues that it had good reason for doing so: Plaintiff performed poorly during 2018 and was therefore placed on a PIP, which, per FEMA policy, ended her telework privileges. ECF No. 30-1 at 34; ECF No. 40 at 14–19. Plaintiff says that "there is a genuine dispute as to whether Plaintiff's performance in 2018 was unacceptable" and claims that the reasons FEMA gave for her low performance rating were false and pretextual. ECF No. 35 at 33–38. The Court concludes that Plaintiff has not raised a triable issue on FEMA's honest belief in the reasons for which it revoked her telework. Judgment will therefore be entered in Defendant's favor on Counts 4, 9, and 14.

### a.     The Relevant, Undisputed Facts

A brief overview of the relevant, undisputed facts related to the revocation of Plaintiff's telework arrangement is necessary. Up until the spring of 2019, Plaintiff and FEMA had a telework arrangement that allowed her to work from home two days per week. ECF No 36-24 at 2. On March 11, 2019, Burchette met with Plaintiff to discuss her work performance in 2018. *See, e.g.*, ECF No. 30-22 at 2; ECF No. 35-1 at 11. During that meeting, Burchette informed Plaintiff that her 2018 performance was unsatisfactory and that as a result she would be placed on a PIP, which would end her telework privileges (per FEMA policy that prohibits telework for employees placed on PIPs). *See, e.g.*, ECF No. 30-22 at 2; ECF No. 35-1 at 11; *see also* ECF No. 30-2 at 6. The PIP, which was set to run for 60 days, was formally issued on April 22, 2019, and was sent to Plaintiff on April 23, 2019. *See, e.g.*, ECF No. 30-2 at 6; ECF No. 30-21 at 2–7; ECF

---

constitute an adverse employment action." *Redmon v. U. S. Capitol Police*, 80 F. Supp. 3d 79, 87 (D.D.C. 2015); *see also Walker v. McCarthy*, 170 F. Supp. 3d 94, 106 (D.D.C. 2016) ("[C]ourts in this Circuit have consistently held that the denial of a request to telework does not, in and of itself, amount to an adverse employment action."), *aff'd*, No. 16-5192, 2017 WL 160806 (D.C. Cir. Jan. 3, 2017). Those cases, however, were decided under the now-repudiated "objectively tangible harm" standard. As explained, the Court need not resolve the issue here because, even if the revocation of teleworking privileges is adverse under the *Chambers* standard, FEMA has nevertheless proffered a legitimate, nondiscriminatory, and nonretaliatory reason for its action—Plaintiff's placement on a PIP—and Plaintiff has produced sufficient evidence from which a reasonable jury could find that that all of FEMA's reasons for the PIP were pretextual.

No. 35-1 at 14.  The PIP explained that Burchette rated Plaintiff's 2018 work performance in the domains of "Communication" and "Teamwork and Cooperation" as "unacceptable."  ECF No. 30-21 at 2.    In the former category, Burchette noted that Plaintiff "abruptly and without communication" left a detail in June 2018, "sent an unprofessional email to [her] cadre manager questioning his judgement regarding [her] requirement to deploy," "criticized a planning course that [she] attended," and "spoke disparagingly, unprofessionally, and critically of [her] cadre manager to one of his colleagues."  *Id.* at 3.  As to "Teamwork and Cooperation," Burchette found that Plaintiff "continued to copy [senior FEMA officials] on emails regarding [her] work even though [she did] not report to them," "did not reach out to [her] team members when appropriate" on a project in July 2018, "which prolonged the project and made it more difficult to complete than was necessary," failed to provide needed context to supervisors on certain assignments, and "failed to work collaboratively and consult with [Burchette] to effectively handle . . . issues when [another supervisor] was unavailable to assist [Plaintiff]."  *Id.* at 4–5.

Thus, the stated reason for FEMA's revocation of Plaintiff's telework privileges was her "unacceptable" work performance during 2018, which resulted in her placement on a PIP pursuant to FEMA policy.  *See* ECF No. 30-1 at 14 ("Because Plaintiff was placed on a PIP, by April 22, 2019, [her] telework was also revoked."); ECF No. 30-2 at 6 ("As part of the PIP, Plaintiff's telework arrangement was revoked by April 22, 2019."); ECF No. 30-22 at 2 ("You are being placed on a [PIP] based on unsatisfactory performance ratings in the core competency areas of communication and teamwork and coordination. . . .  Telework is not allowed during the PIP.").  Plaintiff does not dispute that the revocation came in accordance with FEMA policy which prohibits telework for those employees placed on PIP.  *See* ECF No. 30-32 at 18 ("An employee may not be approved for telework for one year from the date of commencement of a performance

improvement plan (PIP).").  As other courts have found, adhering to such an agency policy is a legitimate reason to revoke an employer's telework arrangement.  *See Esters v. Nielsen*, No. 18-cv-2547, 2021 WL 722883, at \*4 (D.D.C. Feb. 24, 2021) ("Following employer policy certainly constitutes a legitimate reason to deny an employee's telework request.").  With FEMA having proffered a nondiscriminatory and nonretaliatory reason for its revocation of Plaintiff's telework privileges, the Court must determine whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that [FEMA's] asserted non-discriminatory [and non-retaliatory] reason was not the actual reason and [FEMA] intentionally discriminated [or retaliated] against" her.  *Id*. (quoting *Brady*, 520 F.3d at 494).  In making that determination, it is irrelevant whether FEMA's reasons for placing Plaintiff on a PIP, which resulted in the termination of her telework privileges, "were wise, fair, or correct."  *Crockett*, 127 F. Supp. 2d at 47.  Plaintiff therefore misframes the key issue in the analysis when she contends that a "reasonable jury could conclude that [she] successfully performed her job duties" in 2018.  ECF No. 35 at 33–34.  That may be so, but the core inquiry is instead whether she has produced sufficient evidence for a reasonable jury to find that FEMA did not "honestly believe in the reasons it offer[ed]" for revoking Plaintiff's telework privileges, and that it was instead motivated by discrimination or retaliation.  *Fischbach*, 86 F.3d at 1183.  Here, Plaintiff has not done so.

> b.    *FEMA's Reasons for Revoking Plaintiff's Telework Privileges*

Plaintiff focuses her arguments on defending her work performance during 2018, marching point-by-point through each of the alleged deficiencies noted in the PIP and arguing they are either incorrect or otherwise flawed.  ECF No. 35 at 34–38.  Yet "[i]t is not this Court's role to dispute [Burchette's] findings," *Nwachuku v. Jackson*, 605 F. Supp. 2d 285, 290 (D.D.C. 2009), *aff'd*, 368 F. App'x 152 (D.C. Cir. 2010), and, on the whole, the Court views Plaintiff's rebuttals as

arguments about why Burchette's evaluation of her work performance was "not just, or fair, or sensible"—which is not enough to raise a triable issue as to pretext, *Fischbach*, 86 F.3d at 1183. The law is clear that, while perhaps not completely irrelevant, "[a]n employee's subjective assessment of her own performance is insufficient to establish [] pretext" standing alone. *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 192 (D.D.C. 2011); *see also, e.g.*, *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 76 (D.D.C. 2015) (concluding that the plaintiff's "subjective opinion and self-serving statements about whether she deserved [a monetary] award are insufficient to create a genuine dispute of fact"), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015); *Ey v. Office of Chief Adm'r Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 344 (D.D.C. 2013) ("[T]he plaintiff's own disagreement with his supervisors' view is certainly not sufficient to establish pretext or discrimination."). That is because a plaintiff's own view of her performance says little about the whether the decisionmaker honestly believed its proffered non-discriminatory, non-retaliatory reasons. *See Mokhtar*, 83 F. Supp. 3d at 73 ("[I]t is the perception of the decision-maker that is relevant to determining pretext, not a plaintiff's perception of [her]self." (second alteration in original) (quoting *McNally v. Norton*, 498 F. Supp. 2d 167, 183 (D.D.C. 2007)); *Hussein v. Principi*, 344 F. Supp. 2d 86, 98 (D.D.C. 2004) ("[P]laintiff's attempt to show that his superiors were wrong about his performance does nothing to prove that their proffered reasons for [the adverse employment action] were a façade."), *aff'd sub nom. Hussain v. Principi*, 435 F.3d 359 (D.C. Cir. 2006); *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for 'plaintiff's perception of h[er]self, and of h[er] work performance, is not relevant. It is the perception of the decisionmaker which is relevant.'" (quoting *Smith v. Chamber of Commerce of the U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986))), *aff'd*, 298 F.3d 989 (D.C. Cir.

2002), *abrogated on other grounds by Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006). Instead, where, as here, "a plaintiff aim[s] to demonstrate that an employer's performance-based explanation is pretext," they "must provide evidence suggesting that the explanation was a lie." *Robertson*, 767 F. Supp. 2d at 192. More, they must also show "that discrimination [or retaliation] was the real reason" for the adverse action. *St. Mary's Honor Ctr.*, 509 U.S. at 515. Plaintiff has not done so.

To start, however, the Court observes Plaintiff has provided no reason to doubt FEMA's belief that its policy concerning PIPs led to the revocation of her telework privileges. Again, that policy provides that "[a]n employee may not be approved for telework for one year from the date of commencement of a [PIP]." ECF No. 30-32 at 18. When, as here, an employer applies a policy to the employee's detriment, the burden is on the employee to "provid[e] evidence from which a reasonable jury could conclude that [the employer's] articulation of policy is merely a pretext for intentional discrimination." *Santelli v. Electro-Motive, a Div. of Gen. Motors Corp.*, 136 F. Supp. 2d 922, 935 (N.D. Ill. 2001). Plaintiff makes no attempt to do so here. For instance, she has offered no evidence on which a reasonable jury could conclude that FEMA's policy that employees on PIPs may not telework is arbitrary or is otherwise a sham. Likewise, she has failed to provide evidence that the policy was not established or that it was not applied consistently or equally. With that in mind, the Court now turns to what Plaintiff *does* challenge—FEMA's reasons for placing her on the PIP in the first place.

i. June 2018 Detail Departure

As evidence of her shortcomings in the domain of Communication, Burchette cited first an incident from June 2018 when Plaintiff "abruptly and without communication end[ed] [her] detail." ECF No. 30-21 at 3. Plaintiff counters that "Burchette knew that [she] completed the

detail" and asserts that, when asked to extend the detail, she "declined" and communicated her decision via email to the relevant parties. ECF No. 35 at 34–35. Plaintiff's characterization of the incident lacks crucial context, and the Court concludes that she has not shown that a reasonable jury could conclude that FEMA's reason was a pretext for discrimination or retaliation.

The record reflects that Plaintiff was detailed to FEMA's National Preparedness Directorate ("NPD") from February 5, 2018, to June 1, 2018. ECF No. 30-19 at 2–3. The detail assignment was reflected in a Memorandum of Understanding ("MOU") between FEMA's Office of the Administrator and FEMA NPD. *See id.* at 2–6. On May 31, Plaintiff's NPD detail supervisor, Ryan Buras, asked her to extend her detail for additional 30 days. ECF No. 30-30 at 9. Burchette, Plaintiff's first-line supervisor, was not copied on that email. *Id.* The record does not include a document officially extending Plaintiff's detail, but evidently it was extended through July 1, 2018, because, several weeks later, on June 22, Plaintiff emailed Buras and other FEMA personnel about "the status of the MOU for [her] detail extension." ECF No. 36-19 at 3. At that time, however, there was apparently yet another detail extension from the original 30-day extension to July 1, 2018, being discussed. *See id.* On June 26, FEMA replied and told Plaintiff that it would "update [her] MOU and" send her "a copy as soon as possible." *Id.* Yet hours later, Plaintiff emailed Buras, Burchette, and other FEMA officials, writing that she "decided to not extend [her] detail past the original 30 days that Ryan Buras mentioned to me back in May 2018" and that she would be leaving the detail effective July 1. *Id.* at 2. Buras responded that Plaintiff's notice was "unexpected" and that he wished her departure "was communicated better to me." ECF No. 30-30 at 14. That is, the record shows that Plaintiff waited until mere days before a further extension of her detail was set to begin to communicate to her detail supervisor that she would not, after all, further extend, which surprised her detail supervisor. Plaintiff has given no reason for

the Court to conclude that this string of events is suggestive of pretext.  Indeed, it is undisputed that in a later email to Burchette, Buras described Plaintiff's departure from the NPD detail as "[a]brupt[]" and "without any prior notice," which then "caused [Buras's] team to quickly prioritize activities to meet this shortfall."  ECF No. 40-3 at 2.  Importantly, Plaintiff has provided no evidence to indicate that Burchette did not "honestly believe" what Buras told him in that email about her abrupt departure.

Plaintiff does claim that Burchette "knew that Plaintiff completed the detail, which was [originally] scheduled to end on June 1, 2018."  ECF No. 35 at 34.  However, Plaintiff's detail *did not* end on June 1 because, as Plaintiff conceded in her PIP rebuttal, she continued working with NPD "under an expired MOU" from June 4 to June 26.  ECF No. 36-25 at 2.  Plaintiff does not explain why, exactly, these facts might be suggestive of pretext, and the fact that Burchette knew the detail was completed does nothing to undermine the conclusion that Burchette believed her departure was abrupt.

Additionally, Plaintiff appears to suggest that the fact that she "received an acceptable quarterly rating" covering June 2018 and she later received a within-grade pay increase after the NPD detail ended is evidence of pretext.  ECF No. 35 at 35.  The Court is not persuaded.  As to Plaintiff's claim that her "acceptable quarterly rating" is indicia of pretext, the evaluation in question never concludes that her performance during the quarter covering June 2018 was "acceptable," *see* ECF No. 36-15 at 18–19 (describing Plaintiff's second quarter performance but never concluding it was "acceptable"), and Plaintiff's "assessment of her own performance is insufficient to establish such pretext evidence."  *Robertson*, 767 F. Supp. 2d at 192.  In any event, the evaluation does include a note about Plaintiff's departure from the NPD detail, *see* ECF No. 36-15 at 18–19 (noting that Plaintiff left a detail "abruptly" and "without any prior notice"), and

Plaintiff does not dispute that Burchette counseled her about the incident in July 2018, *see* ECF No. 30-8 at 5 (Burchette stating that Plaintiff "was counselled in 2018 on her early termination of a detail to another office. That occurred in July of 2018."). As to the within-grade pay increase that took effect after the detail ended, Defendant explains that the pay increase that took effect in September 2018 was based on Hartzler's performance *in 2017*–a fact which Plaintiff does not dispute. *See* ECF No. 40 at 16 n.5 ("The within grade increase Plaintiff received in September 2018 was based on her performance rating from January 2017 through December 2017, which was not the subject of her PIP."); *see also* ECF No. 36-5 at 5 (showing that Plaintiff's appraisal period for a raise given in 2018 ran from January 1, 2017, to December 31, 2017). That undermines Plaintiff's position, as courts in this District have explained that "[a]n employer's description of an employee's performance as unsatisfactory will not be deemed pretextual just because the employee was a good performer at an earlier time." *Hicks v. Gotbaum*, 828 F. Supp. 2d 152, 163 (D.D.C. 2011). So, the fact that Plaintiff performed well enough in 2017 to merit a pay raise that went into effect in 2018 does not suggest that FEMA's reasoning for critiquing her work performance in 2018 was false or a pretext for discrimination or retaliation.

ii.     Unprofessional Email

In the PIP, Burchette also cited an "unprofessional email" Plaintiff sent in December 2018 to her "cadre manager questioning his judgement regarding [her] requirement to deploy" as one of her shortcomings in Communication. ECF No. 30-21 at 3. The record shows that, in response to her cadre manager's (Garrett Hittle) email stating that Plaintiff was "a great person to progress" and that the "best thing" for her would be "two deployments for [her] of at least 14 days of length each," Plaintiff wrote:

> Have you taken the Documentation Unit Leader course? There is not much to it. Look at the curriculum that I sent you. A cost-benefit analysis of a 28 day

> deployment would cost taxpayers and the Agency unnecessary dollars (my flight, M&I, hotel, any OT) for the 16 remaining tasks in my book. But, if you and my supervisor are willing to make the justification for all those wasted dollars, that is your call.

ECF No. 30-30 at 26.  Plaintiff claims the email was only a portion of "extensive correspondence [she] had with" Hittle and contends that Burchette "took the email out of context and mischaracterized" her communications with Hittle.  ECF No. 35 at 35.  Although she does not provide that context or offer another take on the email in her brief, she points to her rebuttal to the PIP wherein she argued that she "responded to Mr. Hittle appropriately" and that it was "within [her] first amendment rights to question" why she should deploy and "to be concerned with the waste of taxpayer dollars."  ECF No. 36-25 at 6.  Plaintiff's attempts to justify her email fall short because, again, her "assessment of her own performance is insufficient to establish . . . pretext evidence." *Robertson*, 767 F. Supp. 2d at 192; *see also Glass v. Lahood*, 786 F. Supp. 2d 189, 217 (D.D.C. 2011) ("[I]t is axiomatic that a '[p]laintiff cannot establish pretext simply based on her own subjective assessment of her own performance.'" (second alteration in original) (quoting *Waterhouse*, 124 F. Supp. 2d at 7)), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011).  More, even to the extent the record reflects "an unreasonable supervisor who did not like it when his subordinates pushed back," establishing pretext requires more than a showing that "an employer was unfair, vindictive, or otherwise unreasonable." *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 103–04 (D.D.C. 2016).

Plaintiff then appears to argue that Burchette's months-long delay in counseling Plaintiff about her email to Hittle is suggestive of pretext.  ECF No. 35 at 35.  Indeed, she claims that the email was not addressed "until the performance review meeting in March 2019." *Id.*  The reason for the delay, Burchette explained in his deposition, was the government shutdown that began in late December 2018 and lasted until late January 2019.  ECF No. 30-7 at 11.  Although Plaintiff

acknowledges the shutdown, she still faults Burchette for waiting more than six weeks after the government reopened to raise the email issue, particularly because Burchette, evidently, spoke with Hittle and others about her conduct "during the same time period." ECF No. 35 at 35. Yet even assuming FEMA did not counsel or warn Plaintiff concerning this particular email exchange before ultimately placing her on a PIP, the Court would still not find that it demonstrated sufficient evidence of pretext. Notably, Plaintiff has not identified "any evidence that [FEMA] regularly" counseled employees, other than quarterly performance evaluations, prior to placement on a PIP. *Williams v. Perkins + Will, Inc.*, No. 11-cv-1275, 2013 WL 1283379, at *6 (D.D.C. Mar. 29, 2013) (rejecting the argument that a "lack of additional performance evaluations and the lack of warning or counseling regarding [plaintiff's] job performance" was suggestive of pretext); *see also Perry v. Shinseki*, 783 F. Supp. 2d 125, 138–39 (D.D.C. 2011) (finding that it "'may' be probative of the employer's 'true motivation' if (1) the [challenged conduct] is suspicious, in and of itself, [or] (2) the [employer] 'inexplicably departed' from its normal procedures") (quoting *Downing v. Tapella*, 729 F. Supp. 2d 88, 97–98 (D.D.C. 2010))), *aff'd* 466 F. App'x 11 (D.C. Cir. 2012). "Nor does [Plaintiff] point to any persons outside of [her] protected class whom [FEMA] treated more favorably in this regard." *Williams*, 2013 WL 1283379, at *6; *see also Brady*, 520 F.3d at 495 (explaining that, to show pretext, a plaintiff may offer evidence that similarly situated employees outside the protected class were treated "more favorably in the same factual circumstances"). So, "[e]ven if additional performance evaluations or warnings regarding" Plaintiff's email to Hittle "might have been desirable" in this case, here FEMA's "failure to provide such feedback is not sufficient to establish pretext." *Williams*, 2013 WL 1283379, at *6; *see also Scheitlin v. Freescale Semiconductor, Inc.*, No. 08-cv-02342, 2010 WL 2232200, at *6 (D. Ariz. June 3, 2010) (explaining that the employer might have utilized alternative or better practices, but an employer's

failure to do so did not constitute pretext evidence because the anti-discrimination laws do "not mandate best practices"), *aff'd*, 465 F. App'x 698 (9th Cir. 2012). Plaintiff proffers no other reason to doubt that Burchette did not honestly believe that the email was inappropriate given that in it she questioned the judgment one of her managers and characterized his decision to send her on future deployments as a "waste[]" of public funds. *See Johnson v. Dong Moon Joo*, No. 01-cv-4 , 2006 WL 627154, at *34 (D.D.C. Mar. 12, 2006) ("The relevant question at [summary judgment] is not whether [p]laintiff actually committed the actual offenses for which she was under suspicion by [her supervisor]; rather, the pertinent inquiry becomes whether [the supervisor] believed—in good faith—that [p]laintiff had," among other things, "been uncooperative and insubordinate"); *see also Walston-Jackson v. CCA of Tennessee, Inc.*, 664 F. Supp. 2d 24, 28 (D.D.C. 2009) (noting that an employee's insubordinate conduct was "a legitimate non-discriminatory reason" for adverse employment action).

### iii.    Disparaging Remarks

Another knock on Plaintiff's Communication performance, according to Burchette, were disparaging, unprofessional, and critical remarks she made about Hittle to another of her colleagues, Robert Fink. ECF No. 30-21 at 3. Although it is not clear, exactly, what Hartzler said about Hittle or when the statements were made, Burchette testified that he learned of the comments from Fink in approximately December 2018 and that the "gist" of the statements were Plaintiff's complaints about a training course being "a waste of time" and Hittle "not doing a good job of managing the cadre." ECF No. 36-3 at 11. Plaintiff says she did not speak disparagingly of Hittle and asserts that, "[b]ased on Defendant's lack of supporting documentation . . . a reasonable jury could conclude that Plaintiff did ***not*** disparage Hittle during a conversation with Robert Fink." ECF No. 35 at 36. But again, what matters here is whether Burchette harbored an honest belief

that Plaintiff made the disparaging statements attributed to her.  *See Desmond v. Mukasey*, 530 F.3d 944, 963–64 (D.C. Cir. 2008) ("[I]t will not do for the plaintiff to show that the employer's stated reason was false if the employer believed it in good faith; the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory.").

On that front, Plaintiff offers two arguments.  First, she reasons, Burchette conceded that he was not present when the statements were made and did not know exactly what was said.  ECF No. 35 at 36.  But, as Defendant points out, Plaintiff nowhere argues that Burchette could not reasonably rely on Fink's retelling of Plaintiff's statements.  ECF No. 40 at 16.  The fact that an employer's investigation of alleged misconduct relies on hearsay from other employees does not suffice to show pretext or that discrimination or retaliation are lurking.  *See, e.g.*, *Stewart v. Treasure Bay Casino*, No. 12-cv-197, 2015 WL 11112501, at *6 (S.D. Miss. Jan. 7, 2015) (rejecting the plaintiff's arguments of pretext based in part on the fact that his employer relied on the hearsay statements of four other employees), *aff'd*, 622 F. App'x 337 (5th Cir. 2015); *Avena v. Dep't of Human Servs.*, No. 05-cv-0653, 2006 WL 3337519, at *1 (W.D. Tex. Nov. 15, 2006) (employee's argument that employer's investigation relied on hearsay did not show that the employer's "investigation was so seriously flawed that the articulated reason for [the] termination was a pretext for the real, discriminatory reason").  Second, Plaintiff repeats the arguments she made with respect to the alleged unprofessional emails, suggesting—without citation to pertinent authority—that Burchette's failure to "promptly counsel [her] about the alleged issue" is suggestive of pretext.  ECF No. 35 at 36.  That argument fares no better here.  Even if there was no pre-PIP counseling on this matter, there is no evidence that FEMA's conduct was "an "'inexplicabl[e] depart[ure]' from its normal procedures," and therefore "suspicious," because, as

explained, Plaintiff has not offered evidence that FEMA regularly counseled employees prior to placement on PIPs. *Perry*, 783 F. Supp. 2d at 138–39 (quoting *Downing*, 729 F. Supp. 2d at 97–98).

### iv.   Copying Superiors on Work Emails

As for the Teamwork and Cooperation domain, Burchette faulted Hartzler for copying certain superiors, including Kadesch, "on emails regarding [her] work even though [she] does not report to them." ECF No. 30-21 at 4. Plaintiff readily concedes she did this but emphasizes that it became an issue only after she sought accommodations and filed an EEO complaint. ECF No. 35 at 36. Although Plaintiff does not flesh-out her argument further or support it with citations to pertinent authority, she appears to be arguing that the temporal proximity between her protected activity and FEMA's criticism of her email habits is suggestive of pretext. The Court cannot agree. As a matter of law, it would be "improper for a jury to infer that there is . . . pretext based on such temporal proximity standing alone." *Rae v. Children's Nat'l Med. Ctr.*, No. 15-cv-736, 2020 WL 7693612, at *10 (D.D.C. Dec. 28, 2020) (Brown Jackson, J.), *aff'd*, No. 21-7009, 2022 WL 1251723 (D.C. Cir. Apr. 28, 2022), *reh'g en banc denied*, 2022 WL 2541233 (D.C. Cir. July 7, 2022). Thus, and as courts in this Circuit have recognized, "temporal proximity [does] not by itself support a finding of pretext" at the summary judgment stage. *Arnoldi v. Bd. of Trustees, Nat'l Gallery of Art*, 557 F. Supp. 3d 105, 116 (D.D.C. 2021), *aff'd*, No. 21-5182, 2022 WL 625721 (D.C. Cir. Mar. 1, 2022); *see also Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) ("[D]islodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires 'positive evidence beyond mere proximity.'" (quoting *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015))); *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) (noting that "positive evidence beyond mere proximity is required to defeat

the presumption that the [employer's] proffered explanations are genuine" (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007))); *Butler v. D.C. Hous. Fin. Agency*, 593 F. Supp. 2d 61, 67 n.13 (D.D.C. 2009) ("[E]ven if temporal proximity is sufficient to establish causation, [a plaintiff] cannot rely on temporal proximity alone to defeat summary judgment because it is insufficient to establish pretext."). Here, however, Plaintiff has not indicated, much less provided evidence of, any other reason to doubt the sincerity of FEMA's concern about Plaintiff's email practices other than its temporal proximity with her protected activity. Nor has she pointed to other evidence that such concern was merely a pretext for discrimination or retaliation.

v.      Failing to Reach out to Team Members

Another shortcoming noted in the Teamwork and Cooperation domain was Plaintiff's alleged failure to "reach out to [her] team members when appropriate" about a project during the summer of 2018, "which prolonged the project and made it more difficult to complete than was necessary." ECF No. 30-21 at 4–5. The project at issue was Plaintiff's draft of FEMA's Standard Operating Procedures for Consequence Management Planning Support to National Special Security Events within the National Capital Region (the "SOP"). *Id.* In arguing that this criticism of her work was merely pretextual, Plaintiff points to the inability of Burchette or Soucie, who oversaw her work on the SOP, to recall in their depositions which other employees she was supposed to contact, the information she should have collected from them, or why or whether the SOP project was delayed solely due to her alleged shortcomings. ECF No. 35 at 36–38. More, Plaintiff says, she actually "did reach out to team members in connection with the SOP." *Id.* at 38. Although there is more to Plaintiff's challenge to this proffered reason for placing her on the PIP than the preceding ones, the Court is not convinced there is a triable issue here.

68

As the Court has explained, at this stage of the case, what matters is whether Plaintiff has established that a reasonable jury could conclude not only that FEMA's reason was "phony," *Fischbach*, 86 F.3d at 1183, but also that discrimination [or retaliation] was the real reason," *St. Mary's Honor Ctr.*, 509 U.S. at 515. "Thus, '[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence,' and is honestly held, there ordinarily is no basis to put the case to a jury, even if the employee disagrees with the discretionary decision the employer made.'" *Craig v. Mnuchin*, 278 F. Supp. 3d 42, 58 (D.D.C. 2017) (alteration in original) (quoting *Allen v. Johnson*, 795 F.3d 34, 40–41 (D.C. Cir. 2015)). In other words, "a plaintiff aiming to demonstrate that an employer's performance-based explanation is pretext must provide evidence suggesting that the explanation was a lie." *Robertson*, 767 F. Supp. 2d at 192. On this record, the Court finds that no reasonable jury could conclude that FEMA's stated belief—that is, that Plaintiff failed to adequately communicate with her colleagues to the detriment of the agency's work—was a fabrication and therefore pretextual. True, both Burchette and Soucie recalled very little of the underlying incident in their depositions. *See* ECF No. 36-3 at 12–13; ECF No. 36-23 at 15. But, and contrary to Plaintiff's contentions, the record shows she was counseled about the communications failures in connection with the SOP project. On July 26, 2018, she emailed Soucie to complain that she could not meet the deadline for the SOP because of other work assigned to her and recent leave she had taken. ECF No. 40-5 at 2. On July 31, 2018, Soucie responded that the initial SOP deadline could be extended, while emphasizing the importance of the project and requiring a "detailed work plan on what [Plaintiff] ha[d] left to finish, and how [she] intend[ed] to accomplish those components." *Id.* Although Soucie could not recall numerous details of the incident nearly four years later at his deposition in March 2022, including—and particularly—whether Plaintiff actually reached out to colleagues to complete the SOP based on

69

feedback Soucie provided, *see* ECF No. 36-23 at 13–15, the fact that Soucie noted in his July 31, 2018 email to Plaintiff that the SOP's initial deadline had to be scrapped and, more, that she needed to communicate—clearly and in detail—her progress on and plan to complete the work undermines Plaintiff's attempt to show that this reason for the PIP was "phony." *Fischbach*, 86 F.3d at 1183. Still, the fact that neither Burchette nor Soucie could recall whether Plaintiff actually failed to properly communicate with her colleagues in this instance might raise some doubt as to Burchette's "honest belief" in FEMA's reason.

Yet Plaintiff providing some basis to question one of FEMA's bases for finding deficient her performance in the domains of Communication and Teamwork and Cooperation is not reason to find that pretext here. As the D.C. Circuit and numerous others have explained, a plaintiff must "demonstrate that *each* of [her employer's] proffered nonretaliatory reasons for the [adverse action] was pretextual." *Kirk v. Small*, No. 03–5360, 2004 WL 1249294, at *1 (D.C. Cir. June 7, 2004) (emphasis added); *see also Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) ("The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates."); *Tyler v. RE/MAX Mt. States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) ("[A]s a general rule, an employee must proffer evidence that shows each of the employer's justifications are pretextual."); *Chapman v. AI Transp.*, 229 F.3d 1012, 1024–25 (11th Cir. 2000) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."). As another court in this District has explained:

> The plaintiff cannot create a genuine issue of material fact as to whether the [agency] "honestly believes in the reasons it offers" for his termination simply by contesting some portion of the defendant's account of his performance or citing certain instances in which he correctly performed the duties of his job.

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93, 108 (D.D.C. 2007) (quoting *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005)), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008). So, assuming without deciding that "a jury might . . . conclude that one of [FEMA's] proffered reasons" for finding that Plaintiff had not performed well in 2018, which ultimately led to her placement on a PIP and the revocation of her telework privileges, "was false, Plaintiff has not demonstrated pretext as to the other" reasons FEMA says justified the placement on the PIP. *Chambliss v. Nat'l R.R. Passenger Corp.*, No. 05-cv-2490, 2007 WL 581900, at *19 (D.D.C. Feb. 20, 2007), *aff'd*, 262 F. App'x 282 (D.C. Cir. 2007). Thus, "[t]he fact that Plaintiff" may "successfully challenge[] one of [FEMA's] reasons for" placing her on the PIP does not suffice to defeat summary judgment here. *Id.*

### vi.   March 2019 Incidents

The final deficiency Burchette noted in the domain of Teamwork and Cooperation was a combination of incidents in March 2019 when Plaintiff allegedly (1) left documents concerning a project codenamed "Eagle Horizon 2019" in an unmarked envelope on Soucie's desk without any context or "explanation as to what they were or why they were" placed there, which left Soucie befuddled as to "what action was needed from him in regard to the" documents, and (2) failed to contact Burchette to discuss time sensitive "work issues" when Plaintiff knew that Soucie was out of the office and unable to discuss them with her. ECF No. 30-21 at 5. The "work issues" appear to have involved Plaintiff's "work priorities," although neither the parties nor the evidence they submitted make the "issues" particularly clear. *See id.* In any event, Plaintiff claims she sent Soucie an email—but does not produce the actual message—explaining the Eagle Horizon documents she placed on his desk. ECF No. 35 at 38. She also asserts she did not know Soucie was out of the office when she sought to discuss "work issues" with him. *Id.* Neither assertion

casts much doubt on whether Burchette "honestly believed" his criticisms of Plaintiff's work in this regard.

First, Plaintiff never contests that she placed the Eagle Horizon documents on Soucie's desk in an unmarked envelope, and instead merely claims that she sent Soucie an email explaining the nature of the documents. *See* ECF No. 35 at 38. Yet she does not produce the email message she claims to have sent, and more importantly, her assertion that she notified Soucie of the nature of the documents says little about what Burchette—the decisionmaker—knew or believed about the situation. *See Desmond*, 530 F.3d at 96 (explaining that "it will not do for the plaintiff" seeking to show pretext "to show that the employer's stated reason was false if the employer believed it in good faith"). Similarly, she does not dispute that she failed to discuss her "work issues" with Burchette; rather, she only attacks the notion that she knew Soucie was unavailable. Yet Plaintiff failed to support her claim that she was unaware that Soucie could not speak to her with anything other than her unsworn PIP rebuttals. At this stage of the case, that will not do. *See Bush v. District of Columbia*, 595 F.3d 384, 387 (D.C. Cir. 2010) ("[A] court may not consider unsworn statements in determining whether to grant summary judgment."). More, Plaintiff's general assertion that she "effectively handled her duties relating to the Eagle Horizon exercise," *see* ECF No. 35 at 38, is precisely the type of subjective belief that courts have found insufficient, standing alone, to create a triable issue of pretext, *see Robertson*, 767 F. Supp. 2d at 192.

In any event, even if Plaintiff could prove that these reasons for justifying her placement on a PIP were a sham and that Burchette did not honestly believe them, that would still be insufficient to raise a triable issue of pretext. As is evident in the foregoing sections, Plaintiff has not produced sufficient evidence for a rational jury to conclude that "every [other] proffered nonretaliatory [or nondiscriminatory] reason for the [PIP and resulting revocation of her telework

privileges] was pretextual." *Brown v. Vance–Cooks*, 920 F. Supp. 2d 61, 70–71 (D.D.C. 2013) (concluding that "[s]ummary judgment should be granted for an employer where an employee cannot demonstrate that every proffered nonretaliatory reason for" an adverse action "was pretextual").

*    *    *    *    *

For the foregoing reasons, the Court will grant Defendant's bid for summary judgment on Counts 4, 9, and 14.  Even if revocation of a telework arrangement is sufficiently adverse to support discrimination and retaliation claims under the Rehabilitation Act and Title VII (an issue the Court does not decide) FEMA has nevertheless proffered nondiscriminatory and nonretaliatory reasons for rating Plaintiff's 2018 work performance as unacceptable in the categories of Communication and Teamwork and Cooperation—which include, at least, her abrupt departure from her NPD detail in June 2018, her December 2018 email to her cadre manager suggesting that a 28-day deployment would be a waste of money, her disparaging remarks about her cadre manager, and her practice of copying managers to whom she did not report on emails—leading directly to her placement on a PIP and the revocation of her telework arrangement.  Plaintiff's attempts to recast those reasons as pretextual largely fail, primarily because her own, post-hoc justification of her performance is insufficient, standing alone, to raise a triable issue as to pretext.

The Court also observes that Plaintiff failed to raise any other arguments or evidence to support a showing of pretext beyond her denials that certain events occurred or her own views as to whether her conduct was appropriate.  Notably, she did not "cit[e] [FEMA's] better treatment of similarly situated employees outside the plaintiff's protected group," any "inconsistent . . . explanations," FEMA's "deviation from established procedures or criteria," or its "pattern of poor treatment of other employees in the same protected group as" her. *Walker*, 798 F.3d at 1092.  That

is critical because, as explained, Plaintiff has not shown that all—or even a significant majority—of FEMA's reasons for placing on a PIP were trumped-up. That leaves only her own, subjective evaluation of her work performance, which, on its own, would be insufficient for a reasonable jury to find pretext.

> 5.    Denial of a Pay Raise in 2019 (Counts 3, 8, and 13) and Termination (Counts 6, 11, and 16)

Plaintiff alleges that FEMA discriminated (Count 3) and retaliated (Counts 8 and 13) against her when it denied her a within-grade pay increase in September 2019. ECF No. 1 at 11, 13–14. She also makes the same allegations with respect to her ultimate termination that same month. *Id.* at 12–16 (Counts 6, 11, and 16). The Court will consider these claims together because Defendant asserts that Plaintiff's failure to improve her performance while on her PIP led both to the denial of a pay increase and to her firing. *See* ECF No. 30-1 at 15; *see also* ECF No. 30-2 at 9–10. Plaintiff retorts that summary judgment is precluded on these claims because there is a genuine dispute over whether she failed the PIP. ECF No. 35 at 38–45. That is, while the section above dealt with whether Plaintiff has mustered sufficient evidence for a jury to find that FEMA's stated reasons for putting her on a PIP were pretextual, this section addresses whether there is evidence that would allow a jury to find that FEMA's stated reasons for finding that she failed the PIP were pretextual. While the Court believes that a reasonable jury could find that some of the reasons FEMA offered to justify its view that Plaintiff failed the PIP are pretextual, Plaintiff leaves other justifications offered by FEMA for that failure unquestioned. The Court will therefore grant Defendant's motion on Counts 3, 6, 8, 11, 13, and 16.

> *a.    The Relevant, Undisputed Facts*

The Court starts first with the undisputed, material facts. As explained, Plaintiff was placed on a PIP in late April 2019. ECF No. 30-21 at 2–7. The PIP was set to last for 60 days and required

Plaintiff to "improve to a level of 'Achieved Expectations' in each element for which [she was] currently rated as 'Unacceptable'"—that is, as detailed in the foregoing section, Communication and Teamwork and Cooperation.  *Id.* at 2, 6.  The PIP set forth a number of "Improvement Actions to Achieve Expectations" ("Improvement Actions") for each domain (seven for Communication and three for Teamwork and Cooperation).  *Id.* at 3–5.  The PIP called for Burchette to meet with Plaintiff every other week to "discuss [her] progress and job performance" and "the quality and timeliness of [her] work."  *Id.* at 6.  The PIP also advised that failure to meet the "level of 'Achieved Expectations' in all of the identified Core Competencies" could result in "performance-based action, including but not limited to, a reduction in grade, reassignment, or removal."  *Id.*  Finally, the PIP stated that if Plaintiff had "any questions regarding the technical aspects of the PIP," she could contact Kirsten Gunsolus in FEMA's Labor and Employee Relations Branch.  *Id.* at 7. Relatedly, Burchette's email to Plaintiff transmitting the PIP also stated that if she had "any questions we can cover those on your check in meeting with me . . . or you can reach out to Kirsten Gunsolus our Labor and Employee Relations Specialist copied on this email."  ECF No. 36-28 at 2.

The record shows that Burchette sent a number of progress memoranda to Plaintiff during the course of the PIP, which noted shortcomings and provided steps for "Corrective Action."  *See* ECF No. 30-21 at 8–17.  The PIP ended on June 21, 2019, and on July 11, 2019, Burchette notified Plaintiff that she "failed to successfully improve your performance during the PIP period."  *Id.* at 18.  As to Communication, Burchette determined that Plaintiff had successfully completed six of the seven Improvement Actions.  *Id.* at 18–19.  However, he found that she failed the Improvement Action requiring her to

> [C]arefully review emails before sending them and ensure that the message is going only to the necessary and appropriate recipients by considering the appropriate

> chain of command, the nature of the content, and the recipients' positions in the organization.  You must not send an email to unnecessary and/or inappropriate recipients more than 1 time per month.

*Id.* at 19.  Burchette cited five emails that Plaintiff sent in June 2019.  *Id.*  Four of the emails were sent on June 19 and contained Plaintiff's rebuttals to the PIP, wherein Plaintiff disputed FEMA's bases for placing her on the PIP.  *Id.* at 19; *see also* ECF No. 36-25 at 2–18.  Plaintiff sent an additional email containing PIP rebuttals on June 22.  ECF No. 30-21 at 19.  Plaintiff sent all five emails to Burchette and Gunsolus, but also copied Soucie and Ryan Chapline, an attorney at FEMA who Plaintiff says was handling her EEO complaint.  *Id.*; *see also* ECF No. 35-1 at 19–20.  Burchette says it "was not appropriate for [Plaintiff] to send these emails to anyone other than [] Gunsolus and [him]."  ECF No. 30-21 at 19.

As to Teamwork and Cooperation, Burchette found that Plaintiff successfully completed two of the three Improvement Actions.  *Id.* at 20.  The Improvement Action she failed required the following:

> When working on assignments/projects, you must work constructively and collaboratively.  You must communicate clearly and professionally in your verbal exchanges and send emails that clearly and professionally communicate what information you are requesting from your colleagues.  You must not fail to do this more than 1 time per month.

*Id.* at 19–20.  Burchette noted four instances (within a period of eight days) in which Plaintiff's work performance failed to "Achieve Expectations" in this category.  The first is an email Plaintiff sent to multiple FEMA personnel on May 31, 2019, that forwarded another message and stated, "please see email below."  *Id.* at 20.  Burchette concluded that the "email did not clarify what action, if any, was needed on our part or yours."  *Id.*  The next two incidents came on June 4, 2019.  *Id.*  One involved another email that Plaintiff forwarded to multiple FEMA personnel, including Soucie, in which she stated:

> I am forwarding this email to you from NCP for your review (see below).  The email includes the Eagle Horizon 2019 Quick Look Report.  Ms. Osborne recommends that the report be shared with 'Component Leader(s), Staff, and ERG Members.'  Please let me know if you would like me to share it with others in the office.

*Id.*  Burchette determined that Plaintiff "failed to provide appropriate context when you forwarded this email."  *Id.*  Additionally, Burchette observed that Soucie "responded and asked [Plaintiff] to respond with a summary of key takeaways relevant to" their division, "but you failed to respond to that request in a timely manner."  *Id.*  The second incident on June 4 centered around a slideshow presentation that Soucie asked Plaintiff to manage.  *Id.*  According to Burchette, Plaintiff told Soucie that she "did not have host rights in the system to perform this task."  *Id.*  Upon further review, however, Soucie determined that Plaintiff did, in fact, have the necessary "host rights."  *Id.*  Plaintiff does not dispute that.  *See* ECF No. 35 at 43.  This episode reflected a failure to work collaboratively and communicate accurately, Burchette concluded.  *Id.*  The final failure Burchette noted concerned the weekly update Plaintiff sent on June 7, 2019; Burchette found the update "unclear" because it was "vague in regard to what actions [she] had performed for the previous week, and failed to clearly articulate what [she] had done different than what was stated on [her] previous weekly summary reports."  *Id.*

The same day that Plaintiff was advised she failed the PIP, FEMA also issued her a Notice of Proposed Removal wherein Burchette "propose[d] [her] removal from the Federal service based on [her] unacceptable performance" in the domains of Communication and Teamwork and Cooperation.  ECF No. 30-23 at 2–4.  Two months later, on September 11, 2019, Burchette notified Plaintiff that she would not receive a within-grade pay increase because she "failed to demonstrate an acceptable level of performance during" her PIP period.  ECF No. 30-24 at 2.  About two weeks later, Kadesch determined that Plaintiff's employment with FEMA would be terminated effective

September 28.  ECF No. 30-23 at 5–7.  That decision, like the one to withhold her within-grade

pay increase, was "based on [Plaintiff's] failure to successfully improve [her] performance during"

the PIP period.  *Id.* at 5.  So, to be clear, there were two decisionmakers here:  Burchette determined

that Plaintiff would not receive a within-grade pay increase because she failed the PIP, and

Kadesch decided that Plaintiff would be terminated, also because she failed the PIP.

*      *      *      *      *

As she did with FEMA's reasoning for placing her on the PIP, Plaintiff contends that each

of FEMA's bases for concluding that she failed the PIP—which then led to the withholding of the

pay raise and her termination—are either false or otherwise flawed.[12]  *See* ECF No. 35 at 38–45.

As above, to discredit FEMA's asserted reasons for that conclusion, Plaintiff must raise a triable

---

[12] In a pair of sentences in the opening paragraphs of her opposition to Defendant's motion for summary judgment, Plaintiff appears to argue that the reasons she was terminated were too minor to merit that sanction.  *See* ECF No. 35 at 2 ("Defendant fired Plaintiff because she forwarded two emails; she copied her Team Lead and the FEMA attorney assigned to her EEO case when she complained about discrimination; she was unable to both take minutes and run the slideshow at a meeting; and she didn't include enough detail in one of her weekly updates. If these 'transgressions' justify removal, then most of us would be unemployed.").  If she intended that remark to raise the argument that Defendant has failed at step two of the *McDonnell Douglas* burden-shifting analysis to provide a "credible" and "specific" non-discriminatory, non-retaliatory reason for her termination, *Figueroa*, 923 F.3d at 1088, she has not succeeded.  Where, as here, a litigant has "failed to cite any authority in support of [an] argument or to address, in any manner, the relevant inquiry," courts routinely find the putative argument forfeited.  *See, e.g.*, *Giron v. Zeytuna*, __ F. Supp. 3d __, __, 2022 WL 856385, at *13 (D.D.C. 2022).  Even if not forfeited, the argument would fail on its merits.  Defendant has presented admissible evidence supporting his asserted reasons that Plaintiff was terminated for failing the PIP and those reasons are specific enough to "'focus the issues' and provide [Plaintiff] 'with a "full and fair opportunity" to attack the' explanation as pretextual."  *Figueroa*, 923 F.3d at 1088 (quoting *Lanphear v. Prokop*, 703 F.2d 1311, 1316 (D.C. Cir. 1983)).  To the extent that Plaintiff meant the comment set out above to support her argument regarding pretext, she again cites no caselaw indicating that it might be sufficient to overcome summary judgment and, indeed, the cases establish that it is not.  As the Eleventh Circuit has put it—admittedly somewhat brutally:

> Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges.  We are not a "super-personnel department" assessing the prudence of routine employment decisions, "no matter how medieval," "high-handed," or "mistaken."  Put frankly, employers are free to fire their employees for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."

*Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (internal citations omitted) (first quoting *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir.2010), then quoting *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir.1984)).  Because, as discussed below, Plaintiff has not raised a genuine issue of material fact as to whether FEMA acted with discriminatory or retaliatory purpose, that argument—which is, in any case, not properly presented—would fail.

issue as to whether FEMA "honestly believed" the reasons it proffered for concluding that she

failed the PIP "and acted in good faith upon those beliefs." *Crockett*, 127 F. Supp. 2d at 47.  Thus,

"[t]he question is not whether the underlying" incidents FEMA cites as reasons Plaintiff failed the

PIP "occurred; rather, the issue is whether [FEMA] *honestly and reasonably believed* that the

underlying . . . incident[s] occurred." *Brady*, 520 F.3d at 496 (emphasis in original).  So, to survive

summary judgment, Plaintiff must have "produced sufficient evidence for a reasonable jury to find

that [FEMA's] asserted non-discriminatory [or non-retaliatory] reason was not the actual reason

and [FEMA] intentionally discriminated [or retaliated] against [her]"—that is, the reasons offered

for the adverse actions are a pretext for discrimination and retaliation.  *Brady*, 520 F.3d at 494.

More, "[t]o defeat [FEMA's] summary judgment motion," Plaintiff "must demonstrate pretext as

to all of [FEMA's] proffered neutral explanations, not just some of them." *Hairston v. Boardman*,

915 F. Supp. 2d 155, 161 (D.D.C. 2013), *aff'd sub nom. Hairston v. Vance-Cooks*, 773 F.3d 266

(D.C. Cir. 2014).  She has not done so.

### b.    *FEMA's Reasons for Finding Plaintiff Failed her PIP*

#### i.    June 4, 2019 Email

The Court turns first to the domain of Teamwork and Communication.  FEMA concluded

that Plaintiff failed to achieve expectations in that domain during the PIP period in part due to an

email she sent on June 4, 2019.  *See* ECF No. 30-21 at 20.  On that day, Plaintiff forwarded an

email to Soucie that contained a report about the Eagle Horizon project; in the email, Plaintiff

wrote:

> I am forwarding this email to you from NCP for your review (see below).  The
> email includes the Eagle Horizon 2019 Quick Look Report. Ms. Osborne
> recommends that the report be shared with 'Component Leader(s), Staff, and ERG
> Members.'  Please let me know if you would like me to share it with others in the
> office.

*Id.* Burchette concluded that the email "failed to provide appropriate context." *Id.* Neither the parties nor the record indicate the nature of the missing "context." Additionally, Soucie sent a reply email to Plaintiff asking her to prepare "a summary of" the report's "key takeaways relevant to" her division, but Burchette found that she "failed to respond to that request in a timely manner." *Id.* The parties do not say, and the record does not reflect, the exact length of time it took for Plaintiff to provide the "takeaways" Soucie requested. Plaintiff first contends that the PIP Improvement Action in question did not mandate that she "provide appropriate context," and, in any event, she says her email did "provide appropriate context" because she "clearly and professionally communicated the information she was requesting." ECF No. 35 at 42. As to her allegedly untimely response to Soucie's email, Plaintiff claims that Soucie did not communicate a deadline to her and that, when she ultimately responded, Soucie did not indicate that her "response was inadequate or that it failed to demonstrate Teamwork and Cooperation." *Id.* Even considering those explanations, the Court does not find any pretext afoot here.

To start, Plaintiff's contention that the PIP did not require that she provide "appropriate context" does not get her very far. As to this Improvement Action, the PIP stated that, in relevant part:

> You must communicate clearly and professionally in your verbal exchanges and send emails that clearly and professionally communicate what information you are requesting from your colleagues. You must not fail to do this more than 1 time per month.

ECF No. 30-21 at 19–20. As Defendant suggests, no reasonable jury could interpret this language as *not* requiring Plaintiff to provide "appropriate context" when sending emails. *See* ECF No. 40 at 20 n.6. More, Soucie's reply email asking Plaintiff to prepare "a summary of" the report's "key takeaways relevant to" her division, indicates, in real time, that a recipient of the email who understood it contents found its "context" wanting. *Id.* In the face of that evidence, and as the

Court has explained previously, Plaintiff's own, post-hoc evaluation of her performance—in this case, *her view* whether the email "clearly and professionally communicate[d] what information [she] was requesting from [her] colleagues," ECF No. 35 at 42—says little about what Burchette or Kadesch believed and, for that reason, is insufficient, standing alone, to create a triable issue that this performance-based reason proffered by FEMA for finding Plaintiff in violation of her PIP was pretextual. *See, e.g.*, *Robertson*, 767 F. Supp. 2d at 192. Plaintiff also observes that while Burchette found her email responding to Soucie's request for additional take-aways to be untimely, *Soucie* did not provide a deadline for her response. *See* ECF No. 35 at 42; *see also* ECF No. 30-30 at 34. While Defendant does not dispute this, it hardly calls into question *Burchette's* or *Kadesch's* stated view that her response was untimely. Completing a task in a "timely manner" means "without delay," and does not necessarily imply the imposition of a deadline or completing the task prior to a set deadline. *See Timely*, Oxford English Dictionary (defining "timely" as "[q]uickly, rapidly; without delay, promptly"), *available at* https://www.oed.com/view/Entry/202121?rskey=2PmTYZ&result=2&isAdvanced=false#eid (last visited Oct. 26, 2021). Thus, Plaintiff's retort that no deadline was set for her response is largely inapposite. And she does not otherwise challenge FEMA's belief that her response was untimely, much less provide any evidence to demonstrate otherwise.

ii.     June 4, 2019 Presentation

Another alleged failure in the "Teamwork and Cooperation" domain also came on June 4, when Plaintiff allegedly told Soucie that she could not assist with a slide deck presentation because she lacked the proper "host rights" to do so. ECF No. 30-21 at 20. Later, however, FEMA determined that Plaintiff did, in fact, have the necessary "host rights." *Id.* Plaintiff claims that she was unable to operate the slide deck because she was also responsible for taking the minutes of

the same meeting.  ECF No. 35 at 43.  While she does not dispute that she told Soucie she did not

have the appropriate "host rights," she argues that to the extent "she erroneously said" so, "it was

because of symptoms of" a concussion she sustained in May 2019 car accident and was not an

"intentionally . . . false statement." *Id.*  Thus, Plaintiff claims, "a reasonable jury could conclude

that [she] made an honest mistake because she was suffering from a concussion." *Id*.

Whether a jury could find that Plaintiff did not intentionally make a false statement to

Soucie about whether she had the "host rights" is hardly relevant.  *See Desmond*, 530 F.3d at 96

(explaining that "it will not do for the plaintiff" seeking to show pretext "to show that the

employer's stated reason was false if the employer believed it in good faith").  What matters is

whether FEMA "honestly believed" its reason "and acted in good faith upon those beliefs."

*Crockett*, 127 F. Supp. 2d at 47.  On that front, Plaintiff contends that Ashley McKibbin—her co-

worker who was supposed to operate the slide deck that day—was not reprimanded "for failing to

perform her assigned task at the June 4th meeting."  ECF No. 35 at 43.  McKibbin, Plaintiff says,

is not disabled and had not requested reasonable accommodations from FEMA, nor had she

engaged in protected activity.  *Id.*  It is true that an employer's more favorable "treatment of

similarly situated employees outside the plaintiff's protected group" is evidence from which a jury

"could reasonably conclude evinces an illicit motive."[13]  *Walker*, 798 F.3d at 1092; *see also Esters*,

2021 WL 722883, at *5 ("In order to survive summary judgment on a pretext argument, [the

plaintiff] may show that 'similarly situated employees' experienced different treatment." (quoting

*Walker v. McCarthy*, 170 F. Supp. 3d 94, 107–08 (D.D.C. 2016))).  Indeed, "[s]uch evidence gives

rise to an inference that the employer treated other employees outside the protected class 'more

favorably in the same factual circumstances,' suggesting that [Plaintiff] was treated less favorably

---

[13] Notably, McKibbin is the only comparator Plaintiff offers up in her lengthy opposition.  And even so, as
demonstrated above, the attempt is half-hearted

on account of her protected status." *Id.* (quoting *Walker*, 170 F. Supp. 3d at 107–08). "To raise such an inference, however, the plaintiff must 'demonstrate that "all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee[s]."'" *Id.* (alteration in original) (quoting *Walker*, 170 F. Supp. 3d at 107–08). "Similarly situated employees tend to share similar jobs and job duties, deal with the same supervisor, and experience similar responses to similar conduct," and if a plaintiff "fails to produce 'evidence that the comparators were actually similarly situated to [her], an inference of falsity or discrimination is not reasonable,' and summary judgement is appropriate." *Id.* (alteration in original) (quoting *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008)). Ultimately, while "determining whether two employees are similarly situated is ordinarily a question of fact for the jury," the non-moving party must present enough evidence from which a rational jury could conclude that they are indeed "similarly situated" to the plaintiff. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016).

Here, Plaintiff fails to provide any basis for a jury to find that that she and McKibbin are "similarly situated." She fails to even recite, much less analyze and address, the relevant factors that might lead a jury to make such a finding. At the very least, there is no showing that McKibbin, like Plaintiff, was on a PIP—which itself would indicate that the two are improper comparators. *See, e.g.*, *Sampson v. Integra Telecom Holdings, Inc.*, 461 F. App'x 670, 674 (10th Cir. 2012) (finding that plaintiff was not similarly situated to potential comparators because, among other things, comparators were not on PIPs); *Myers v. U.S. Cellular Corp.*, 257 F. App'x 947, 953 (6th Cir. 2007) (similar); *Brown v. Sybase, Inc.*, 287 F. Supp. 2d 1330, 1344 (S.D. Fla. 2003) (similar). Accordingly, and because Plaintiff does not otherwise challenge FEMA's reason involving the June 4 presentation, no reasonable jury could find pretext here.

iii.    June 7, 2019 Email

Another infraction FEMA noted in concluding that Plaintiff failed her PIP involved a June

7, 2019 email she sent her supervisors updating them as to her weekly activities.  ECF No. 30-21

at 20.  Specifically, Burchette explained that Plaintiff

> [L]isted only two bullet points stating that [she] "attended the CMSC and draft the
> notes" and "research[ed] and development of the DC Community Profile."  [Her]
> update was vague in regard to what actions [she] had performed for the previous
> week, and failed to clearly articulate what [she] had done different than what was
> stated on [her] previous weekly summary reports.

*Id*.  In response, Plaintiff notes that Burchette conceded in his deposition that he found Plaintiff's

June 7 update lacking because she "had established a very high standard" in her prior updates, and

this particular update did not meet that standard.  ECF No. 35 at 44 (citing ECF No. 36-3 at 20).

Although Plaintiff does not further expand on this argument, the Court sees it as little more than a

subjective re-grading of her own performance, which, again, is insufficient standing alone to show

that FEMA's reason was pretextual.  *See Robertson*, 767 F. Supp. 2d at 192.  And the fact that

Plaintiff's prior weekly updates were well-received does not mean that reasons offered for grading

subsequent updates as unsatisfactory are pretextual.  *See Hicks*, 828 F. Supp. 2d at 163 ("An

employer's description of an employee's performance as unsatisfactory will not be deemed

pretextual just because the employee was a good performer at an earlier time.").  She then contends

that it is "unclear" how her June 7 email failed to meet the requirements of her "performance plan."

ECF No. 35 at 44.  The "performance plan," however, is a different document—unrelated to the

PIP—that outlines the "core competencies" of Plaintiff's position and sets forth standards for

achieving them.  *See* ECF No. 36-15.  Plaintiff's "performance plan" is not at issue here; the PIP

is, and Plaintiff does not contend that her email met its standards.  More, Plaintiff's own view of

what her performance plan or PIP required is not particularly compelling given that she has not

proffered evidence sufficient to show that Burchette did not harbor an honest belief in his view that her June 7 update was deficient.  Indeed, it is telling that she does not contest his finding that the update she offered was "vague."

iv.     May 31, 2019 Email

The Court next addresses the May 31, 2019 email Plaintiff forwarded to Burchette, Soucie, and another FEMA official.  In the text of the email forwarding the prior email, Plaintiff wrote only "please see email below."  ECF No. 30-21 at 20.  The "email below" was from other FEMA employees asking Plaintiff whether they could "meet with [her] face to face about the duties of an office floor warden and the specifics for [her] floor" and noting that they were "attempting to set up some emergency training for [her] entire office staff."  ECF No. 36-35 at 2.  Burchette concluded that the forwarded "email did not clarify what action, if any, was needed on our part or [Plaintiff's]."  *Id.*  Plaintiff claims that her "email was short and self-explanatory" and that no additional clarification was needed.  ECF No. 35 at 41.  Additionally, she observes that the PIP Improvement Action her email allegedly violated states that Plaintiff was not to fail to meet the Improvement Action's standard "more than 1 time per month," yet the May 31 email is the only listed infraction for the month of May.  *Id.* at 41.  These arguments will be addressed in turn.

To start, Plaintiff's post-hoc review of the merits of her own email does not create a triable issue.  Again, the question is not whether the email actually constituted a failure of the Improvement Action, but rather whether FEMA honestly believed it did.  *See Desmond*, 530 F.3d at 964 (explaining that "it will not do for the plaintiff" seeking to show pretext "to show that the employer's stated reason was false if the employer believed it in good faith").  Plaintiff's "subjective assessment of her own performance" with respect to the May 31 email "is insufficient to establish" that FEMA did not honesty believe in its reason—that is that the reason was

pretextual—and is therefore insufficient to stave off summary judgment. *Robertson*, 767 F. Supp. 2d at 192. So, even if Plaintiff is right that her email needed no further explanation, Defendant's bid for summary judgment is none the weaker.

That said, Plaintiff's observation concerning the PIP's "more than 1 time per month" language is well-taken. Again, the Improvement Action at issue here stated that Plaintiff "must not fail to" meet its expectations "more than 1 time per month." ECF No. 30-21 at 5. And yet, as Plaintiff notes, the May 31 email is the only instance in the month of May that FEMA identified as an infraction. *See id.* at 20. The Court concludes that a reasonable jury could find that FEMA did not "honestly believe" that the May 31 email alone constituted a violation of the PIP, because a fair reading of the PIP is that Plaintiff *could* successfully complete this Improvement Action if she failed to meet expectations on a single occasion during a particular calendar month even if that failure occurred within a month-long period that included other failures to meet those same expectations. *See Brady*, 520 F.3d at 495 (noting that pretext can be established by "demonstrat[ing] that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision"). Be that as it may, the Court nevertheless concludes that Plaintiff has not overcome Defendant's bid for summary judgment because even if a reasonable jury could conclude that FEMA did not honestly believe the May 31 email constituted a violation of the PIP, FEMA has offered other, legitimate reasons why Plaintiff failed her PIP. Accordingly, any successful challenge to this reason does not preclude summary judgment in Defendant's favor. *See, e.g.*, *Brown*, 920 F. Supp. 2d at 70 (concluding that "[s]ummary judgment should be granted for an employer where an employee cannot demonstrate that every proffered nonretaliatory reason for" an adverse action "was pretextual").

v.    PIP Rebuttal Emails

Burchette also found that Plaintiff performed unsatisfactorily in the Communication domain during the PIP period because she sent five emails containing her PIP rebuttals not only to Burchette and Gunsolus, but also to Soucie and Chapline, who Plaintiff asserts was the FEMA attorney handling her EEO complaint.  ECF No. 30-21 at 19; ECF No. 35 at 18.  Burchette found the inclusion of the latter two recipients to be "not appropriate."  ECF No. 30-21 at 19.  In his deposition, Burchette—who made the decision to withhold the within-grade pay raise—explained that, "[p]er the Performance Improvement Plan . . . [Plaintiff] was not supposed to send e-mails outside the chain of command that was highlighted for her in the Performance Improvement Plan," and that "[t]he appropriate chain for the rebuttals would've been [Burchette] and [Gunsolus]." ECF No. 36-3 at 15–16.  Kadesch, who was the ultimate decisionmaker in Plaintiff's termination, stated in his deposition that he "thought it was inappropriate for [Plaintiff] to go to anyone that wasn't directly involved in the PIP."  ECF No. 36-10 at 18.  Those explanations notwithstanding, Plaintiff nevertheless contends in her brief that "it is unclear why copying Soucie and Chapline was inappropriate," and then goes on to explain why she copied those two recipients and why doing so was logical and appropriate.  ECF No. 35 at 39–40.  She also observes that the PIP did not pose an absolute bar to "sending emails outside of her chain of command," but rather emphasizes the need to "consider[] the appropriate chain of command," which she says she did. *Id.*  Ultimately, she argues that "a reasonable jury could conclude that it was not inappropriate for her to copy Soucie and Chapline on the PIP Rebuttals."  *Id.* at 40.  The Court concludes that Plaintiff is only half right:  while a reasonable jury could fairly question FEMA's objection to Plaintiff copying Soucie, Plaintiff's evidence is insufficient to question FEMA's objection to Plaintiff copying Chapline.

As to Ryan Chapline, the FEMA attorney she says was handling her EEO complaint, Plaintiff says she copied him on her PIP rebuttal emails because in the weeks before she sent the emails, she had filed an EEO complaint alleging that her placement on the PIP was discriminatory and retaliatory and she repeated those claims in the PIP rebuttals. ECF No. 35 at 40. That may be so, but that does not undermine Burchette's and Kadesch's reason for finding that copying Chapline was inappropriate. Both believed that Plaintiff went outside the appropriate chain of command when copying Chapline on her message.[14]   *See* ECF No. 36-3 at 15; ECF No. 36-10 at 18. In fact, as far as the record shows, Chapline was not copied on Burchette's email transmitting the PIP to Plaintiff and did not otherwise participate in the PIP process. *See* ECF No. 36-28 at 2. The fact that Plaintiff believed that Chapline, too, should have been involved in the email thread does not suffice to show pretext on the part of Burchette or Kadesch. Indeed, and as Defendant notes and the records make plain, Plaintiff was well aware of the "separate" and proper channels for raising claims of discrimination and retaliation. *See* ECF No. 40 at 19–20.

Plaintiff's challenge concerning her inclusion of Soucie on her PIP rebuttal emails is more successful. Plaintiff seizes on Kadesch's statement in his deposition that "it was inappropriate for her to go to anyone that wasn't directly involved in the PIP"; Plaintiff claims that Soucie was directly involved in her PIP because (i) he attended the performance review wherein Burchette notified her that she was being placed on a PIP; (ii) Burchette consulted Soucie when drafting the PIP; (iii) Soucie attended PIP progress meetings; and (iv) Burchette copied Soucie on the email

---

[14] Indeed, Plaintiff herself notes that Kadesch testified that at the time Plaintiff sent the emails in question in June 2019, Burchette did not know that Chapline was involved in handling Plaintiff's EEO complaint because Burchette did not know that such a complaint had been filed. ECF No. 35 at 40; *see also* ECF No. 36-10 at 18 (stating that in July 2019, Burchette did not know Plaintiff had filed a formal EEO complaint). Similarly, Kadesch testified that he did not know that Plaintiff had filed an EEO complaint at that time. *See* ECF No. 36-10 at 18 (stating that based on an unsuccessful attempt at alternative dispute resolution, Kadesch knew that Plaintiff had the right to file an EEO complaint but he did not know that she had done so). That is, to Burchette and Kadesch, Plaintiff was copying an individual who had no connection to her PIP or to any complaint of discrimination she had filed.

transmitting the PIP to Plaintiff.  *See* ECF No. 35 at 39.  Defendant does not dispute those allegations.  *See* ECF No. 40 at 19.  The fact that Soucie was plainly involved in the PIP process, and particularly the fact that Burchette copied him on the email transmitting the PIP to Plaintiff, casts doubt on FEMA's reasoning here.  If Burchette saw fit to include Soucie on the email message transmitting the PIP to Plaintiff, it is difficult to understand why Plaintiff copying Soucie on an email responding to the findings made in the PIP was objectionable.

Defendant attempts to bolster FEMA's reasoning by arguing that the "PIP specifically stated that Plaintiff was to direct all communications regarding the PIP to Mr. Burchette and Ms. Gunsolus."  ECF No. 40 at 19.  But the PIP does not actually say that.  Granted, it states that "any questions regarding the technical aspects of the PIP" should be directed to Gunsolus, *see* ECF No. 30-21 at 7, and Burchette's transmittal email says that "any questions" concerning the PIP could be directed to him or Gunsolus, *see* ECF No. 36-28 at 2, but nowhere does it direct that "all communications regarding the PIP" be sent only to those individuals.  For all these reasons, the Court finds that a reasonable jury could conclude that the critique based on Plaintiff's inclusion of Soucie on the PIP rebuttal emails was untrue.  *Fischbach*, 86 F.3d at 1183.

Yet that does not conclude the analysis and preclude summary judgment in Defendant's favor with respect to Plaintiff's failure under the PIP, because, again, Plaintiff must "demonstrate that *each* of [her employer's] proffered nonretaliatory reasons for the [adverse action] was pretextual" to push her claims past the summary judgment stage.  *Kirk*, 2004 WL 1249294, at *1 (emphasis added); *see also Brown*, 920 F. Supp. 2d at 70–71 (concluding that "[s]ummary judgment should be granted for an employer where an employee cannot demonstrate that every proffered nonretaliatory reason for" an adverse action "was pretextual").  As explained in the preceding sections, Plaintiff has not established that her FEMA supervisors did not "honestly

believe" each of the reasons for concluding that she failed her PIP such that a jury could find that the alleged PIP failure was a pretext for discrimination or retaliation.  More, even as to this particular reason, Plaintiff has not shown that FEMA's reason was entirely phony because, as explained, there were legitimate reasons for finding that copying Chapline on the PIP rebuttal emails was inappropriate.

*     *     *     *     *

For the foregoing reasons, the Court will grant Defendant's motion on Counts 3, 6, 8, 11, 13, and 16.  To be sure, a reasonable jury could conclude that one, or perhaps two of the reasons FEMA offered for concluding that Plaintiff failed her PIP—which led to the denial of a within-grade pay raise and, ultimately, her firing—were false.  However, she has not raised a triable issue of fact as to the falsity of its other reasons—Plaintiff's emails of June 4 and June 7, 2019; her conduct in connection with the June 4 presentation; and the fact that she copied Chapline on her PIP rebuttal emails.  She has therefore failed to raise a triable issue of fact as to whether the finding that she failed her PIP was a pretext for discrimination or retaliation.

### C.      FMLA Claim (Count 17)

The seventeenth and final count in Plaintiff's Complaint is a claim that FEMA interfered with her FMLA rights when they denied her requests to take leave under that statute in August 2019—that is, after FEMA began the process of removing Plaintiff from her post but before she was officially terminated.  ECF No. 1 at 15.  Defendant argues that he is entitled to summary judgment on the claim because Plaintiff has no right of action under the FMLA and, even if she did, FEMA was in the process of terminating Plaintiff's employment when she sought leave under the statute and therefore did not interfere with her leave rights.  ECF No. 30-1 at 54–55.  Plaintiff does not respond to those arguments in her opposition; indeed, she does not discuss her FMLA

90

claim at all.  As such, and as other courts have done in similar circumstances, the Court finds that Plaintiff has conceded the argument and will grant summary judgment in Defendant's favor on Count 17. *See, e.g.*, *Holassie*, 2022 WL 296288, at *1 n.2, *8 (granting summary judgment to defendant on claim that was made in plaintiff's complaint but that plaintiff did not mention in their opposition brief).

In any event, Plaintiff has no right of action under the FMLA, which "entitles eligible employees to take unpaid leave for family and medical reasons." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 160 (D.C. Cir. 2015).  "Employees are covered by either Title I or Title II of the law." *Manga v. Carranza*, No. 18-cv-437, 2020 WL 1451584, at *5 (D.D.C. Mar. 25, 2020). Generally speaking, Title I "governs private sector and federal employees with less than 12 months of service, and Title II pertains to federal employees with more than 12 months of service." *Chandler v. Bernanke*, 531 F. Supp. 2d 193, 201 (D.D.C. 2008) (citing 29 U.S.C. §§ 2601 *et seq.* and 5 U.S.C. §§ 6381 *et seq.*).  At the time she sought FMLA leave, Plaintiff had worked for FEMA for longer than 12 months, and therefore was a Title II employee.  *See* ECF No. 1 at 4 (alleging that Plaintiff began interning for FEMA in June 2014 and became a career employee in September 2015); *id.* at 10 (alleging that Plaintiff submitted a request for FMLA leave in August 2019).  But that dooms her FMLA claim, because while Title I employees enjoy a private right of action under the FMLA, *see* 29 U.S.C. § 2617(a)(2), "Title II contains no analogous provision," *Manga*, 2020 WL 1451584, at *5 (quoting *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016, 1018 (9th Cir. 1999)); *see also Burg v. U.S. Dep't of Health & Human Servs.*, 387 F. App'x 237, 240 (3d Cir. 2010) ("Although Title I of the FMLA expressly provides a private right of action, Title II does not.  '[T]he absence of an express waiver of the government's sovereign immunity in Title II of the FMLA bars private suits for violations of its provisions.'" (internal citation omitted)

(quoting *Russell,* 191 F.3d at 1019)); *Coulibaly v. Blinken*, No. 14-cv-712, 2022 WL 3976806, at *2 n.4 (D.D.C. Sept. 1, 2022) ("Unlike a Title I employee, a federal Title II employee does not have a private right of action under the FMLA.").  While the D.C. Circuit has not yet addressed this issue, other courts in this District have "consistently" concluded that Title II employees may not sue under the FMLA, and "every circuit court to review this issue" has reached the same result. *Manga*, 2020 WL 1451584 at *6 (collecting cases from the Third, Fourth, Ninth, Eleventh, and Federal Circuits).  So, because it is undisputed that Plaintiff was a Title II employee, any FMLA claims "are barred because Title II lacks a private right of action." *Id.*  Thus, even if Plaintiff had not conceded the issue, the Court would nevertheless have granted Defendant's motion for summary judgment on Count 17.[15]

## CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment (ECF No. 30) in full.  A separate order dismissing the case will issue.

Date: October 27, 2022

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

---

[15] At the tail end of her brief, Plaintiff asserts that a trial is necessary to resolve what she characterizes as "serious witness credibility issues."  ECF No. 35 at 45–47.  She notes an episode during Kadesch's deposition where he admitted that he communicated with an attorney for Defendant during a break despite "agree[ing] under oath not to refer to anything on his computer or any other resources during the deposition." *Id.* at 46.  Following the break, Plaintiff emphasizes that Kadesch "repeated the same answer in response to each question" about the PIP rebuttal emails—that is, it was inappropriate for Plaintiff to copy anyone other than Burchette and Gunsolus on those emails because those were the only two persons involved in the PIP. *Id.*  She also recounts that, before Soucie's deposition, her counsel requested that Soucie and Defendant's counsel "keep their hands visible during the deposition to prevent coaching."  Thereafter, Plaintiff says, "Soucie was unable to answer the vast majority of substantive questions during the deposition." *Id.*  These issues do not mandate that a trial be held in this case.

Preliminarily, and as Defendant notes, the Court need not even consider Plaintiff's arguments because the bulk of them appear on pages that exceed the Court's page-count limits. *See* ECF No. 40 at 28 n.12.  This District's Local Rules cap opposition briefs at 45 pages, *see* Local Civil Rule 7(e), a requirement that this Court's Scheduling and Procedures Order repeated, *see* ECF No. 17 at 2–3.  Yet all but two sentences of Plaintiff's arguments concerning the "serious witness credibility issues" appear on pages 46 and 47 of her brief, *see* ECF No. 35 at 46–47, and she never sought the Court's leave to file excess pages, *see* ECF No. 40 at 28 n.12.  In any event, Plaintiff does not explain why the "credibility issues" she identifies raise genuine disputes of material fact.